**CUTCO INDUSTRIES, INC.,**
**Plaintiff-Appellant,**

v.

**Dennis E. NAUGHTON,**
**Defendant-Appellee.**

**No. 1315, Docket 86–7169.**

United States Court of Appeals,
Second Circuit.

Argued May 16, 1986.

Decided Nov. 26, 1986.

Steven M. Pesner, New York City (Robert A. Gaynor, Eugene Killian, Jr., Anderson Russell Kill & Olick, P.C., New York City, of counsel), for plaintiff-appellant.

Bernard J. Rosenthal, New York City (Gilbert, Segall and Young, New York City, Douglas L. Carden, Shapiro, Laufer, Posell, & Close, Los Angeles, Cal., of counsel), for defendant-appellee.

Before KAUFMAN, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal requires us to decide whether New York courts would find jurisdiction over non-resident defendant, Dennis E. Naughton, under the state's long-arm statute, N.Y.CPLR 302(a)(1). The United States District Court for the Eastern District of New York (Bramwell, J.), without conducting an evidentiary hearing, held that they would not, and dismissed the complaint pursuant to Fed.R.Civ.P. 12(b)(2). Plaintiff, CutCo Industries, Inc., appeals that order entered January 31, 1986. Because the district court erroneously concluded that plaintiff had failed to establish *prima facie* personal jurisdiction over defendant, we reverse and remand this case to the district court for an evidentiary hearing.

## I FACTS

The following facts are either uncontested or appear from the plaintiff's papers and affidavits; since the complaint was dismissed without an evidentiary hearing we accept the latter as true for purposes of this appeal. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 56–57 (2d Cir. 1985).

Plaintiff is a New York corporation that franchises hair salons throughout the United States under the trade name "Great Expectations Precision Haircutters." While a resident of Arizona, Naughton developed a business relationship with plaintiff in 1978 which led to his acquiring ownership interests in five of these salons between 1978 and 1981. The business relationship began when Naughton telephoned CutCo in New York to express interest in acquiring a Great Expectations franchise with two business associates, Milton Dahlene and W.J. Wade. Naughton spoke with Norman Bander, CutCo's Franchise Marketing Director, and the two agreed that (1) Bander would send Naughton the relevant materials, including a proposed licensing agreement; (2) Naughton and Wade would visit an available mall site in Lakewood, California; and (3) Dahlene would come to New York to meet with CutCo representatives to discuss the proposed venture.

Dahlene came to New York where he met with Bander and other CutCo representatives and discussed in detail the operations of a Great Expectations salon, the financial and other terms and conditions of the licensing agreement and sublease for the Lakewood salon, and the relationship that would exist between CutCo and the potential licensees. Bander gave Dahlene a copy of the standard Great Expectations sales kit and other written material, though no agreement was entered into during Dahlene's visit. After Dahlene's visit, Naughton informed Bander that he, Dahlene, and Wade would purchase the Lakewood franchise through WND, Inc., a corporation formed to effectuate the purchase that was owned equally by the three co-venturers. Naughton's counsel represented at oral argument that WND, Inc. had not been formed at the time of Dahlene's visit to New York.

Naughton visited CutCo's offices on three different occasions from December 1978 to September 1982. In December 1978, he attended a national seminar sponsored by CutCo for its franchisees in New York. The seminar consisted primarily of discussions, workshops, and meetings related to new products, training, management, advertising, and salon operations. CutCo's Vice-President in Charge of Marketing and Naughton discussed the operations of the Lakewood salon and the possibility of Naughton purchasing additional CutCo sa-

lons. Again, in 1981 Naughton and Dahlene visited CutCo's New York offices and discussed the operations of Naughton's four existing salons as well as the possibility of his opening additional ones.

In September 1982, Naughton came to New York to discuss the possibility of opening a new chain of haircutting salons under the name "Great Cuts." Naughton's plan was to own and operate these salons with his partners and to pay CutCo a small royalty. In order to effectuate this plan, Naughton asked to be released from the restrictive covenants under his five existing franchise agreements. CutCo turned down this request and instead urged Naughton to open additional "Great Expectations" salons.

In August 1985, Naughton—who had by this time become a resident of California—ceased his involvement in four of the salons and notified plaintiff of his intention to terminate the existing franchise agreement for the fifth salon. Several months later he opened two new hair salons and re-opened the fifth salon under the trade name "The Look Apart." As a result, CutCo brought this diversity suit alleging that Naughton's actions violated the in-term restrictive covenants in the five Great Expectations franchise licensing agreements or, in the alternative, the post-term restrictive covenants contained in Naughton's various licensing agreements with CutCo.

During its seven-year relationship with Naughton, CutCo asserts that it has been in constant communication with him by telephone and through correspondence, providing technical advice, advertising, and equipment. Naughton and his business associates telephoned CutCo's offices in New York and regularly forwarded royalties, fees, and reports to plaintiff in New York. CutCo sent personnel to visit defendant's salons. Moreover, each franchise agreement signed by Naughton and CutCo provided that any dispute arising under them would be governed by New York law and that any arbitrable dispute would be argued in New York. Naughton consented to the jurisdiction of the New York courts over the enforcement or confirmation of any award rendered by an arbitrator.

After examining plaintiff's pleadings and other documents, the district court dismissed CutCo's complaint finding that the recited facts when viewed as a whole failed to establish personal jurisdiction over Naughton.

## II OVERVIEW

Before we embark on our examination of the problem at hand, a brief overview of the subject will provide a helpful analytical framework for the discussion that will follow.

The legal question posed by this appeal is whether a resident of Arizona and later California transacted business in New York sufficient to subject him to its long-arm jurisdiction in a diversity suit commenced in federal court. Critical to its resolution is the proper approach to the conflicting factual claims that ordinarily arise when lack of personal jurisdiction is asserted. Fed.R. Civ.P. 12(d) grants a district court judge broad discretion in such cases to hear and decide the motion before trial or to defer the matter until trial. The district court may conduct such a hearing based solely upon papers or by a proceeding in which evidence is taken. Because the federal rules provide no statutorily prescribed course, the district court is free to decide the best way to deal with this question, and its choice may be set aside on appeal only upon a finding of an abuse of discretion.

 Whatever procedural path the district court chooses to follow determines the plaintiff's burden of proof and the standard to be applied on appeal. If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of personal jurisdiction over defendant, *Marine Midland Bank N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). But if the court holds an evidentiary hearing—in a manner similar to determining the issue at trial—the plaintiff must demonstrate personal jurisdiction by a preponderance of the evidence. *Hoffritz*, 763

F.2d at 57. On appeal, we review *de novo* the legal question of whether a *prima facie* case has been established. After a hearing, where findings are made by the trial court, those findings may be set aside on appeal only when clearly erroneous.

### III DISCUSSION

#### A. *Personal Jurisdiction under New York Law*

■ With this analysis in mind, we turn to the specifics of the instant case. Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits. *Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2d Cir.1963) (en banc). Although, as alluded to, the plaintiff has the ultimate burden of establishing jurisdiction over defendant by a preponderance of the evidence, *Marine Midland*, 664 F.2d at 904, until an evidentiary hearing is held, it need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists. *Id.; United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir.), *cert. denied*, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 693 (1966). Those documents are construed in the light most favorable to plaintiff and all doubts are resolved in its favor. *Hoffritz*, 763 F.2d at 57. Despite CutCo's assertion to the contrary, nothing in the district court's statement from the bench indicates that it ignored the *prima facie* standard and applied the more stringent preponderance of the evidence standard to the papers submitted by plaintiff in support of its claim of jurisdiction.

CutCo contends that jurisdiction over Naughton exists under New York's long-arm statute, N.Y.CPLR 302(a)(1), which provides in pertinent part:

> (a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state
>
> ....

N.Y.CPLR 302(a)(1) (McKinney Supp.1986). The long-arm statute gives New York personal jurisdiction over a nondomiciliary if two conditions are met: first, the nondomiciliary must "transact business" within the state; second, the claim against the nondomiciliary must arise out of that business activity. *See McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981) (an "articulable nexus between the business transacted and the cause of action sued upon" is essential). A nondomiciliary "transacts business" under CPLR 302(a)(1) when he " 'purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws,' " *McKee Electric Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y. S.2d 34, 229 N.E.2d 604 (1967) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)); *accord Mayes v. Leipziger*, 674 F.2d 178, 183 (2d Cir.1982); *see also Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 457 n. 5, 261 N.Y.S.2d 8, 209 N.E.2d 68 ("the statutory test may be satisfied by a showing of ... purposeful acts"), *cert. denied*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965).

No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper. *See Sterling National Bank and Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870, 873, 874 (2d Cir.1975); *Longines-Wittnauer*, 15 N.Y.2d at 457, 261 N.Y.S.2d 8, 209 N.E.2d 68. Bearing these standards in mind, we now turn to the pleadings to determine whether plaintiff CutCo has alleged sufficient "Naughton contacts" with New York to establish *prima facie* personal jurisdiction over the defendant.

#### B. *Dahlene's Visit to New York*

CutCo asserts that Dahlene's visit to New York should be considered a significant jurisdictional contact attributable to

Naughton because Dahlene was acting as Naughton's agent at the time of the visit. The district court found that Dahlene could not be considered Naughton's agent because he was not under Naughton's control.

■ In determining whether an agency exists under § 302, courts have focused on the realities of the relationship in question rather than the formalities of agency law. *Galgay v. Bulletin Co.,* 504 F.2d 1062, 1065 (2d Cir.1974); *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322, 1346 (E.D.N.Y.1981). To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state "for the benefit of, and with the knowledge and consent of" the non-resident principal. *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981); *Plaza Realty Investors v. Bailey,* 484 F.Supp. 335, 347 (S.D.N.Y.1979); *Louis Marx & Co. v. Fuji Seiko Co., Ltd.,* 453 F.Supp. 385, 390 (S.D.N.Y.1978). *See also Galgay,* 504 F.2d at 1065 (agent must act "at the request and for the business purposes of" the principal); *East New York Savings Bank v. Republic Realty Mortgage,* 61 A.D.2d 1001, 1002, 402 N.Y.S.2d 639 (2d Dep't 1978) (principal must request the performance of these activities in New York and the activities must benefit it). Some courts have also required the principal to exercise "some control" over the agent. *See, e.g., Grove Press,* 649 F.2d at 122. The district court, relying on these cases, found that Naughton did not exercise sufficient control over Dahlene to establish an agency for the purpose of the long-arm statute.

■ We agree with the district court that some control is necessary to establish agency for jurisdictional purposes. But the court overstated the degree of control necessary to find such an agency among business associates by insisting upon a greater degree of control than that which is required by common law agency rules. Under traditional agency law, joint participation in a partnership or joint venture establishes "control" sufficient to make each partner or joint venturer an agent of the others. *Cf. Latta v. Kilbourn,* 150 U.S. 524, 543, 14 S.Ct. 201, 208, 37 L.Ed. 1169 (1893) ("[b]y the well settled law of partnership each member of the firm is both a principal and an agent"); *see also* N.Y.Partnership Law § 20(1) (McKinney 1948) ("Every partner is an agent of the partnership...."); 16 N.Y.Jur.2d *Business Relationships* § 1587 at 264 (1981) ("Each joint venturer ordinarily stands in the relation of principal, as well as agent, as to each of the other co-venturers."). Consistent with those well-settled principles, we hold that where there is joint control of a business enterprise—similar to that existing in a partnership or joint venture— enough control has been shown to establish *prima facie* this particular element of agency to satisfy long-arm jurisdiction.

With this in mind, we emphasize that our conclusions, based on bare allegations, relate only to CutCo's *prima facie* case. Plaintiff CutCo must still prove personal jurisdiction over Naughton by a preponderance of the evidence either at an evidentiary hearing or trial. Accordingly, the district court, upon remand, must make further factual findings to determine whether the plaintiff has established by a preponderance of the evidence that (1) the arrangement among Naughton, Dahlene and Wade was sufficiently analogous to a joint venture or partnership to show joint control of a common enterprise, (2) Dahlene was acting with the consent and knowledge of Naughton, and (3) Dahlene was evaluating a joint business opportunity for the benefit of all, rather than investigating a personal investment decision, as Naughton and Dahlene allege.

## C. *Choice of Law and Arbitration Clauses*

■ The district court correctly held that an agreement to arbitrate in New York is irrelevant when the cause of action being sued upon does not constitute an arbitrable dispute. The district court also correctly noted that a choice of law provision in a contract does not constitute a voluntary submission to personal jurisdiction. Yet it

erred in not giving some weight to the choice of law provision. The Supreme Court in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985), recently stated that choice of law provisions should not be ignored when making jurisdictional determinations. Although such provisions standing alone are insufficient to confer jurisdiction, the Court held them relevant in determining whether a defendant purposefully availed himself of the forum's laws under constitutional jurisdictional constraints. *Id.* We believe that New York would likewise consider choice of law clauses to be relevant in determining whether a nondomiciliary "transacted business" for CPLR 302(a)(1) purposes. *See Uniroyal, Inc. v. Heller,* 65 F.R.D. 83, 91 (S.D.N.Y.1974) (choice-of-law clause constitutes a "significant contact" with the forum under § 302(a)(1)).

### D. *Naughton's Visits to New York*

#### 1. *The 1978 Visit*

The district court characterized Naughton's 1978 visit to New York as insubstantial and stated that mere presence in the forum state and a visit to a convention does not establish CPLR 302 jurisdiction. In support of that finding, Naughton argues that his attendance at the 1978 seminar cannot be attributed to him individually, as he was acting on behalf of the corporation, WND, Inc., and thus was protected by New York's fiduciary shield rule.

Naughton's attendance in December 1978 at CutCo's seminar and later detailed discussions with CutCo's representatives are not jurisdictionally insignificant and should have been accorded some weight by the district judge. The fiduciary shield doctrine holds that the acts of an agent performed in New York for an out-of-state corporation will not form the basis for exercising jurisdiction against the agent as an individual, but may be used to subject the corporation to jurisdiction. *See, e.g., Merkel Associates, Inc. v. Bellofram Corp.,* 437 F.Supp. 612, 618 (W.D.N.Y.1977). Although criticized, and not constitutionally

required, *see Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984), the fiduciary shield doctrine appears to survive under New York law. *Thomson McKinnon Securities v. Hamiltonian Industries,* 610 F.Supp. 5, 7 (S.D.N.Y.1985).

The district judge did not address the application of the shield rule because it found jurisdiction lacking for other reasons. We need not decide its applicability either, except to note that upon remand the court should consider whether in 1978 Naughton was acting for WND's benefit or his own. In that connection, the record discloses that all salons purchased after Naughton's 1978 visit were acquired either by him personally or by WND Great Expectations, an Arizona partnership. The corporation appears to have purchased only the first salon in September 1978, which suggests that Naughton may have been acting in his individual capacity during his December 1978 visit.

#### 2. *The 1981 Visit*

Naughton maintains that his 1981 meeting at CutCo's New York offices were purely social and hence irrelevant to a CPLR 302 determination. The district court agreed and found the 1981 visit jurisdictionally unimportant. We take a different view.

■ Acts performed by a defendant subsequent to the execution of a contract are ordinarily of jurisdictional consequence. *Sterling National Bank,* 510 F.2d at 873; *Galgay v. Bulletin Co.,* 504 F.2d at 1064. In *Sterling National Bank* we noted that few business discussions can be characterized as entirely social. *Sterling National Bank,* 510 F.2d at 873 n. 2. Although Naughton's meetings with CutCo's representatives during his first two visits to New York were not solely for business purposes, business discussions did take place which were instrumental in his decision to open additional franchises. Naughton's 1981 visit to New York created the likelihood of a more solid business relationship between the parties and resulted in the acquisition of an additional salon and a

new franchise agreement for the Downey, California location. The restrictive covenant in that agreement, as in the others, was also allegedly breached. Accordingly, Naughton's 1981 visit has jurisdictional significance. *See Capitol Cabinet Corp. v. Interior Dynamics, Ltd.*, 541 F.Supp. 588, 590 (S.D.N.Y.1982) (negotiations and discussions in the forum state relevant to the formation of a contract constitute the purposeful transaction of business for an action arising out of the alleged breach of that contract); *George Reiner & Co., Inc. v. Schwartz*, 41 N.Y.2d 648, 653, 394 N.Y. S.2d 844, 363 N.E.2d 551 (1977) (same).

### 3. *The 1982 Visit*

 Similarly, the district court attached no jurisdictional relevance to Naughton's third New York appearance in 1982 during which he proposed opening a new chain of haircutting salons. The court stated, "[a]ttempts to adjust a dispute as to performance of a contract or to discuss differences under an existing contract have no jurisdiction [sic] consequences." We agree that Naughton's 1982 presence in New York should be considered jurisdictionally irrelevant inasmuch as attempts to renegotiate an existing contract do not constitute a CPLR 302 "transaction of business." *McShan v. Omega Louis Brandt et Frere, S.A.*, 536 F.2d 516, 518 (2d Cir.1976).

### E. *The Remaining Contacts*

Plaintiff next asserts that Naughton is subject to the jurisdiction of the New York courts because he sent royalties, fees and financial information to New York, communicated extensively with CutCo's New York office and subjected himself to its ongoing supervision. The district court believed that defendant's continuous contact with CutCo's New York office was required by plaintiff under the franchise agreement, and that it could not therefore be said that defendant purposefully availed himself of the privilege of conducting activities in New York. We disagree. In *Burger King*, 105 S.Ct. at 2186–87, the Supreme Court held that contract provisions which

require franchise owners to send "all relevant notices and payments" into the forum state and which subject the owners to the supervision of the corporation in the forum state are contacts which are relevant for jurisdictional purposes. Again, we believe New York courts would also find these contacts relevant in determining whether a non-resident "transacted business" in New York under the long-arm statute.

### IV CONCLUSION

Assessing the totality of Naughton's acts in New York, we believe CutCo has established *prima facie* jurisdiction. Thus, we reverse and remand this matter to the district court. If the district court chooses to conduct an evidentiary hearing, rather than determine the jurisdictional issue at trial, CutCo will bear the burden of establishing personal jurisdiction over Naughton by a preponderance of the evidence.

Reversed and remanded.