The UNITED BANK OF KUWAIT,
PLC, Plaintiff,

v.

JAMES M. BRIDGES, LTD. and James
M. Bridges, Defendants.

No. 90 Civ. 3944 (RPP).

United States District Court,
S.D. New York.

June 4, 1991.

Winston & Strawn, New York City by: Thomas J. Quigley and Irma Kanter Nimetz, for plaintiff.

Siff, Rosen & Parker, New York City by John H. Somoza and Ross, Dixon & Masback, Washington, D.C. by David R. Dwares, for defendants.

**ROBERT P. PATTERSON, Jr., District Judge.**

This an action for malpractice against a Virginia accountant and his accounting firm. Defendants move pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure to dismiss the action for lack of personal jurisdiction. For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

The facts underlying this motion are not in dispute. Defendant James M. Bridges ("Bridges") is a certified public accountant who resides in the state of Virginia and is the general partner of James M. Bridges, Ltd., a five-person accounting firm with its only office in Dale City, Virginia.

On June 29, 1988 Bridges signed a letter of engagement with Southern Atlantic Mortgage, Inc. ("Southern Atlantic"), a Virginia mortgage broker, under which Bridges was to conduct an audit of Southern Atlantic for the fiscal years ending June 30, 1987 and June 30, 1988. Bridges Aff., Exh. A. The letter of engagement, entered into in Virginia, does not mention the purpose of the audit but Bridges testified that the audit was completed to show compliance with Housing and Urban Development ("HUD") regulations and for internal management purposes. *Id.* ¶ 18; Defendants' Memorandum of Law and Supporting Exhibits (hereinafter "Def. Mem. of Law"), Exh. 2 at 123. Bridges performed all work necessary to complete the audit in the state of Virginia and on August 30, 1988 sent the certified financial statements to Southern Atlantic in Woodbridge, Virginia. Bridges Aff. ¶ 17; Def. Mem. of Law., Exh. 5.

Plaintiff United Bank of Kuwait, PLC ("UBK") is a British bank having offices in New York City. In October 1987, Southern Atlantic and UBK had entered into a Mortgage Warehousing Loan and Security Agreement ("the Security Agreement") under which UBK was to extend a $10 million revolving line of credit to Southern Atlantic to allow Southern Atlantic to finance and resell residential mortgage loans. Berrio Aff., Exh. A. The Security Agreement required Southern Atlantic to provide UBK within 120 days of the end of each fiscal year annual financial statements certified without qualification.

In September 1988, UBK began reviewing financial statements provided by its borrower Southern Atlantic for the years

ending June 30, 1987 and June 30, 1988 to determine whether to renew the line of credit which was to expire in October 1988. Marlene Berrio ("Berrio"), a UBK officer, claims she detected arithmetic errors in the statements Southern Atlantic had provided. Berrio Aff. ¶ 8. She telephoned Bridges, the auditor listed on the statements, to inquire about the errors and was referred to Sebastian Palack ("Palack"), a staff accountant at Bridges who had been in charge of the audit. Palack and Berrio ascertained that the statements certified by Bridges contained different figures than those Berrio stated were in the documents she possessed. Berrio apparently sent Palack those documents and in response in November 1988 Palack forwarded true copies of the statements with a handwritten cover note stating:

MARLENE:
PLEASE USE THIS COPY FOR ALL YOUR PURPOSES.
THE STATEMENTS YOU SENT US WERE NOT WHAT WE HAD ISSUED TO SOUTHERN ATLANTIC.
ANY QUESTIONS, CALL US.
    SEBASTIAN
    JAMES M. BRIDGES, LTD.

Berrio Aff., Exh. C.

UBK renewed its Security Agreement with Southern Atlantic. However, on June 30, 1989, UBK declared Southern Atlantic in default under the Security Agreement and demanded immediate repayment. Southern Atlantic failed to repay its indebtedness resulting in a loss to UBK in excess of $2 million. Berrio Aff. ¶ 11.

The financial statements prepared by Bridges reflect that UBK was Southern Atlantic's largest lender. During the course of the audit, Bridges sent UBK a "Standard Bank Confirmation Inquiry" dated July 1, 1988 requesting information about Southern Atlantic's indebtedness under the line of credit. Berrio Aff., Exh. B.

---

1. Plaintiff's analysis of Bridges' receipt yield slightly different figures: $362,707 in total revenues in 1988 and $302,759 in 1989.

    Bridges did not testify to the firm's 1987 revenues. Plaintiff apparently estimated it to be $151,837 based on the individual invoices provided in discovery. Because it seems ano-

UBK returned the signed statement to Bridges on July 6, 1988. Bridges acknowledged at his deposition that he or his firm "may have reviewed" the Security Agreement during its audit of Southern Atlantic. Nimetz Aff., Exh. 6 at 130.

Bridges testified at his deposition that the firm's gross revenues were $308,617 in 1988 and $399,032 in 1989. Nimetz Aff., Exh. 13.[1] Documents produced in discovery show that Bridges derived revenues of $34,587 and $41,345 in 1988 and 1989, respectively, from sources outside Virginia.

UBK commenced this action for accountants malpractice in Supreme Court for the State of New York, County of New York. On June 11, 1990 defendants removed the action to federal court. On June 18, 1990 defendants filed a motion to dismiss the complaint under Rules 12(b)(2) and 12(b)(6). At oral argument on September 27, 1990 the Court denied the motion without prejudice to renew after limited discovery on the issue of personal jurisdiction. On February 22, 1991 defendants filed the instant motion to dismiss for lack of personal jurisdiction.

## DISCUSSION

■ In order to defeat a motion to dismiss for lack of personal jurisdiction brought after discovery, plaintiff must make a prima facie showing of facts, which if credited by the trier of fact, would suffice to establish jurisdiction over the defendant. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). Bare allegations of jurisdiction will not suffice where, as in this case, discovery has taken place. *Id.*

UBK relies N.Y. C.P.L.R. § 302(a)(3)(ii) (McKinney 1990) which provides for long-arm jurisdiction over any non-domiciliary defendant who:

malous that the firm's revenues doubled between 1987 and 1988 but remained constant thereafter, and because Bridges nowhere confirms nor denies the accuracy of plaintiff's figure, the Court excludes data for 1987 from its jurisdictional analysis.

3. commits a tortious act without the state causing injury to person or property within the state ..., if he

....

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; ....

Defendants concede that the tort alleged to have been committed, the negligent preparation and certification of financial statements, took place "without the state," namely, in Virginia. The issue presented is whether UBK has made a sufficient showing as to the remaining elements of jurisdiction under § 302(a)(3)(ii).

1. Causing Injury Within the State

UBK claims that jurisdiction is proper in New York because Bridges' negligent preparation and certification of financial statements in Virginia caused injury to UBK in New York in the form of losses suffered by UBK upon Southern Atlantic's default.

■ New York courts uniformly hold that the situs of a nonphysical, commercial injury is "where the critical events associated with the dispute took place." *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 433 (2d Cir.1971) (quoting *Spectacular Promotions, Inc. v. Radio Station WING*, 272 F.Supp. 734, 737 (E.D.N.Y.1967)). The occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York. *See Pocahontas Supreme Coal Co. v. National Mines Corp.*, 90 F.R.D. 67, 73 (S.D.N.Y.1981). *See, e.g., Mije Assocs. v. Halliburton Servs.*, 552 F.Supp. 418 (S.D. N.Y.1982) (financial loss to New York partnership insufficient where acts of professional malpractice occurred exclusively in Kentucky); *Weiss v. Greenberg, Traurig,*

*Askew, Hoffman, Lipoff, Quentel & Wolff, P.A.*, 85 A.D.2d 861, 446 N.Y.S.2d 447 (App.Div.1981) (diminution in value of plaintiff's second mortgage and note located in New York not a sufficient injury where acts of legal malpractice causing such diminution took place in Florida); *Chemical Bank v. World Hockey Ass'n*, 403 F.Supp. 1374, 1380 (S.D.N.Y.1975) (injury resulting from tort of conversion deemed to occur in Maryland or New Jersey where defendants' acts respecting the property were committed, even though plaintiff alleged injury to security interest located in New York).

■ Assuming plaintiff's allegations to be true, the real injury in this case alleging accountant malpractice is the loss of services suffered by Southern Atlantic under its auditing contract with Bridges. There is no claim that there was an existing relationship between Bridges and UBK. Accordingly, the injury UBK claims it suffered is not direct but "remote and consequential," *see Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 94 (2d Cir.1975), in relation to events which transpired exclusively in Virginia.[2]

2. Expects or Should Reasonably Expect to Have Consequences in the State

Bridges maintains that UBK cannot demonstrate that Bridges expected or reasonably should have expected its acts in preparing the financial statements to have consequences in New York.

■ The test of whether the defendant knew or reasonably should have known that his acts would have consequences in the forum state is an objective rather than subjective one. *See Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547 (App.Div.1974). The requirements for accountants liability in New York suggest the appropriate contours of an objective

2. Defendant cites *Marine Midland Bank v. Keplinger & Assocs.*, 488 F.Supp. 699, 703 (S.D.N.Y. 1980), for the proposition that since disbursements to Southern Atlantic from UBK were made in New York, the situs of the injury was New York. That case is distinguishable. Marine Midland's injury was not remote or consequential because it had hired the defendant directly and it was the only party who suffered any loss—loss of services or otherwise—as a result of defendant's acts. The same is true of *Bankers Trust Co. v. Mora*, 523 F.Supp. 285 (S.D.N.Y.1981), also relied upon by plaintiff.

test. In general, before an accountant may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, the accountant must have been aware the reports were to be used for a particular purpose, in furtherance of which a known party was intended to rely, and there must have been some conduct on the part of the accountant which evinces the accountant's understanding of that party's reliance. *See Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 483 N.E.2d 110, 118, 493 N.Y.S.2d 435, 443 (1985).

■ Where, as here, the accountant is unaware of the purpose of the audit because the client does not inform him of the purpose in the letter of engagement, there is no basis for a reasonably prudent accountant to expect to be haled into any particular forum. To hold that simply because UBK was one of the Southern Atlantic's creditors, Bridges knew or reasonably should have known that any errors in the audit would have consequences to UBK in New York would render an accountant subject to personal jurisdiction in any forum in which creditors of his clients are located. Such a result seems manifestly unreasonable.

■ UBK also relies on communications between a Bridges staff accountant and Marlene Berrio at UBK, including the transmission to UBK in November 1988 of a copy of the financial statements Bridges had prepared. These events transpired several months after the audit was completed and the alleged negligent acts occurred and arose out of an unsolicited request by UBK. The phrase, "Please use this for all your purposes," appears under the circumstances to be idiomatic rather than imperative.[3] These facts make it far from clear that at the time Bridges pre-pared the financial statements in Virginia for its Virginia client, defendants knew or reasonably should have known that their acts would have consequences to UBK in New York or would have been relied upon by UBK to extend credit.

3. Derives Substantial Revenue from Interstate Commerce

■ The record shows that in 1988 Bridges derived no more than 10% of its revenues from clients outside Virginia in each of the years 1988 and 1989. Bridges' receipts reveal that many of the firm's out-of-state clients are located in the adjoining states of Maryland and the District of Columbia. Revenues derived from these local clients cannot credibly be deemed revenues from "interstate" commerce in any but the most literal sense. *See Markham v. Gray*, 393 F.Supp. 163, 166 (W.D.N.Y. 1975) ("interstate commerce under Section 302(a)(3)(ii) should be construed to … exclude a local physician who treats his patients in two bordering states"), *aff'd*, 531 F.2d 634 (2d Cir.1976).

■ Excluding local clients in the surrounding states, the record shows that Bridges derived no more than 1% (approximately $2000) of his revenues in 1988 from bona fide interstate commerce and no more than 8% (approximately $22,600) in 1989.[4] These figures are insubstantial in both relative and absolute terms in relation to a firm with annual revenues of over $300,000. *See Ronar, Inc. v. Wallace*, 649 F.Supp. 310 (S.D.N.Y.1986) ($6500 in consulting fees constituting 20% of defendant's annual revenues not substantial revenue from interstate commerce); *Vecchio v. S & T Mfg. Co.*, 601 F.Supp. 55 (E.D.N.Y. 1984) ($7400 or 1% of total revenues not prima facie evidence of substantial interstate revenues).[5] The requirement that the

---

3. At the time he wrote the cover note, Palack, a native of India, had been living in the United States little over a year and a half. Palack Aff. ¶ 3.

4. A number of the individual receipts appear to be for preparation of individual tax returns for members of the armed forces.

5. UBK's reliance on *Nichols v. Surgitool, Inc.*, 419 F.Supp. 58 (W.D.N.Y.1976), is misplaced. The court found jurisdiction under C.P.L.R. § 302(a)(3)(ii) because "defendant's business was national in scope" without comparing out-of-state to total revenues. When the court held that 7% of revenues constituted "substantial revenues," it was analyzing jurisdiction under § 302(a)(3)(i), not applicable here.

defendant derive substantial revenue from interstate commerce was meant to exclude businesses whose operations are local in nature. *See Markham,* 393 F.Supp. at 166, *aff'd,* 531 F.2d 634 (2d Cir.1976).

In sum, plaintiff has failed to make a prima facie showing of facts, which if credited by the trier of fact, would suffice to establish jurisdiction over the defendant under C.P.L.R. § 302(a)(3)(ii).

### 4. Due Process

■ Due process requires that a non-domiciliary defendant have sufficient minimal contacts with the forum state such that the exercise of long-arm jurisdiction over him does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Due process is satisfied as long as there is purposeful activity by the defendant in the forum giving rise to a reasonable anticipation of being haled into court there. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–474, 105 S.Ct. 2174, 2181–2183, 85 L.Ed.2d 528 (1985). Purposeful activity is found where the defendant has deliberately engaged in significant activities within the state or has created continuing obligations between himself and the residents of the forum state. *Id.* at 475–76, 105 S.Ct. at 2183–84. The exercise of long-arm jurisdiction over Bridges in this action would violate the due process clause because Bridges has engaged in no activity, purposeful or otherwise, in New York.

Accordingly, defendants' motion to dismiss the complaint is granted. This case is ordered closed.

IT IS SO ORDERED.