**BENJAMIN SHERIDAN CORPORATION, a Delaware corporation, Plaintiff,**

v.

**BENJAMIN AIR RIFLE COMPANY, a Missouri corporation, Katt and Katt, a Wisconsin general partnership, and Raymond L. Katt, an individual, Defendants.**

No. 92–CV–6422L.

United States District Court, W.D. New York.

July 20, 1993.

David L. Hoffberg, Nixon, Hargrave, Devans & Doyle, Rochester, NY, Claire V. Eagan, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, for plaintiff.

Kenneth A. Payment, Harter, Secrest & Emery, Rochester, NY, for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiff, Benjamin Sheridan Corporation ("BSC"), a Delaware corporation with its principal place of business in New York, commenced this action against Benjamin Air Rifle Company ("BARC"), a Missouri Corporation with its principal place of business in Wisconsin, Katt and Katt ("K & K"), a Wisconsin general partnership, and Raymond L. Katt ("Katt"), a resident of Wisconsin, claiming breach of contract and fraud. BSC's claims arise from its purchase of BARC and K & K assets used in the manufacture and sale of airguns and related products. BSC claims that defendants failed to disclose that (1) certain models of airguns manufactured by BARC contained a defective trigger mechanism; (2) earlier models also contained defects; and (3) 255 defective airguns were manufactured and sold from obsolete inventory in the two months before the purchase.

Defendants now move to dismiss the complaint for lack of personal jurisdiction and lack of venue pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(3), or, in the alternative, to dismiss the complaint for a failure to join an indispensable party pursuant to Fed.R.Civ.P. 12(b)(7) or to transfer this action to the United States District Court for the Eastern District of Missouri.[1] For the following reasons defendants' motion to dismiss for lack of personal jurisdiction is granted.

## BACKGROUND

In the summer of 1991, Leonard Pickett ("Pickett"), a representative of PEXCO Holdings, Inc., located in Oklahoma, the parent company of Crosman Corporation ("Crosman"),[2] contacted Raymond Katt, the president of BARC, to inquire if BARC was for sale. (Affidavit of Raymond Katt ("Katt Aff.") at ¶ 5). Katt, who was in Wisconsin when he received the call, expressed some interest and instructed Pickett, who Katt believed was in Tulsa, Oklahoma, to contact BARC's accountant, Wayne Grace ("Grace"), who was in St. Louis, Missouri. Pickett contacted Grace and sometime later Grace sent BARC's financial information to Pickett. Pickett later made a "ball park" offer, and Katt notified Pickett that he wanted to pursue further negotiations. A meeting was held in St. Louis in either October or November, 1991. Katt; his wife, Louise; his lawyer, Llewllyn Sale; Pickett; Grace; Crosman's President, Kenneth Scheele; and an attorney from Tulsa, Oklahoma representing Crosman, Larry Sandell, attended the meeting. At the meeting the parties reached an agreement on the basic terms and conditions of the sale. At this point, there had been no

---

1. A lawsuit brought by defendant, Katt, against BSC is currently pending in the Eastern District of Missouri. The lawsuit involves the same agreements at issue here.

2. Crosman, a Delaware Corporation with its principal place of business in New York, manufactures airguns and related products and was a competitor of BARC.

contact with or reference to New York whatsoever.

At Crosman's request, BARC sent prints and drawings of its products to Crosman's New York office. Representatives of Crosman also travelled to Racine, Wisconsin to tour the BARC facilities there. Katt's son, David, an officer and employee of BARC, travelled to New York to tour the Crosman facility, but the purpose of the visit, according to Katt, was for David to discuss the possibility of working for Crosman after the sale was completed. (*Id.* at ¶ 8). Crosman eventually sent Katt a letter of intent setting forth an offer to purchase various assets of BARC and K & K. However, Katt felt the letter did not accurately reflect all the matters agreed to at the meeting. Consequently, the parties engaged in further negotiations over the phone. Katt did not travel to New York during this round of negotiations.

The parties agreed to the terms of a new, revised letter of intent. In a letter dated December 9, 1991, Crosman set out its offer. (Plaintiff's Brief in Opposition ("Pl.'s Brief"), Ex. A). At about the same time, Crosman was in the process of incorporating a subsidiary corporation. The new subsidiary, BSC, rather than Crosman, was going to acquire BARC's and K & K's assets. On January 9, 1992, the parties, BSC, BARC, and K & K, entered into a Purchase Agreement ("Agreement") in New Orleans, Louisiana.

In addition to setting out the terms of the sale, the Agreement provided that at the time of the closing, Katt would enter into a Non–Competition Agreement ("NC Agreement") with BSC, and that payment under the NC Agreement would be guaranteed by Crosman according to two written guaranties ("Guaranties"). The Agreement also contained a choice-of-law provision which stated that the Agreement and the legal relations of the parties would be "governed by and construed in accordance with the laws of the State of New York applicable to agreements made in such state between residents thereof and to be wholly performed therein." (Pl.'s Brief, Ex. C at ¶ 13.06).

On February 28, 1992, the parties closed the deal in St. Louis, Missouri. During the closing the parties signed the NC Agreement, the Guaranties, and other related documents, including an Indemnification Agreement between Katt and BSC in which Katt agreed to indemnify BSC under certain circumstances. The NC Agreement, Guaranties, and Indemnification Agreement all contained choice-of-law provisions which stated that the agreements would be governed by, and construed and enforced in accordance with the laws of the State of New York. (Pl.'s Brief, Exs. D–G).

Approximately five months after the closing, in July, 1992, BSC received a letter from one of its customers at its facility in Racine, Wisconsin. The letter described an unexpected discharge from a Sheridan Model C9 airgun as the safety was being disengaged. (Compl. at ¶ 25). BSC contacted the customer who then returned the airgun to BSC's Racine facility in August, 1992. BSC employees at the Racine facility examined the airgun and verified the customer's complaint. BSC's Racine facility notified BSC's corporate headquarters in East Bloomfield, New York of the potential trigger defect.

BSC immediately stopped manufacturing and distributing airguns that contained the possibly defective trigger mechanism, and began a design study of the trigger and safety mechanism used in Benjamin model and Sheridan model airguns. BSC determined that the design specification created the potential for those airguns to discharge as the safety was being disengaged, that BARC began manufacturing airguns that contained the defective trigger on or about February 7, 1991, and that a total of 65,189 airguns with the defective trigger had been manufactured since that date—44,321 by BARC and 20,868 by BSC.

BSC also discovered that prior to February 7, 1991, BARC had been using a trigger mechanism in some of its airguns that was also defective, the airgun had the potential to fire when dropped from a short distance. Because of this defect, BARC switched to the new trigger design on February 7, 1991. BSC claims, though, that BARC sold 255 airguns that utilized the pre-February 7, 1991 firing mechanism before the deal closed on February 28, 1992.

BSC subsequently commenced this lawsuit claiming breach of contract and fraud. BSC alleges that by failing to inform it of the defects in the trigger mechanism and of BARC's sale of the 255 defective airguns, defendant breached certain covenants and warranties in the Purchase Agreement and committed fraud. BSC seeks damages and a declaratory judgment against Katt that it is entitled to offset the losses it incurred from the breaches of warranties and representations against payments owed to Katt under the NC Agreement. Defendants now move, *inter alia*, to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(2) on the ground that this court lacks personal jurisdiction over them.

## DISCUSSION

### I. *Personal Jurisdiction: The Legal and Evidentiary Standard*

"Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits." *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986) (citations omitted). Although "the plaintiff has the ultimate burden of establishing jurisdiction over defendant by a preponderance of the evidence, until an evidentiary hearing is held, it need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *Id.* (citation omitted). "[T]his remains true notwithstanding a controverting presentation by the moving party." *Hoffritz For Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985).

"In the absence of an evidentiary hearing on the jurisdictional allegations, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to plaintiff, and where doubts exist, they are resolved in the plaintiff's favor." *Id.* "But if the court holds an evidentiary hearing—in a manner similar to determining the issue at trial—the plaintiff must demonstrate personal jurisdiction by a preponderance of the evidence." *Cutco Indus.*, 806 F.2d at 364.

### II. *N.Y.Civ.Prac.L. & R. § 302(a)(1)*

BSC contends that this Court may exercise jurisdiction over defendants pursuant to CPLR § 302(a)(1). That statutory section authorizes New York courts to exercise personal jurisdiction over any non-domiciliary, who in person or through an agent, "transacts any business within the state or contracts anywhere to supply goods or services in the state."[3] BSC contends that defendants have "transacted business" in New York and "contracted anywhere" to supply goods in New York.

#### A. *Transacts Business*

■ The "transacts business" clause of the long-arm statute "gives New York personal jurisdiction over a non-domiciliary if two conditions are met: first, the non-domiciliary must 'transact business' within the state; second, the claims against the non-domiciliary must arise out of that business activity." *Cutco Indus.*, 806 F.2d at 365.

"A non-domiciliary 'transacts business' under CPLR 302(a)(1) when he 'purposely avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits of its laws.'" *Cutco Indus.*, 806 F.2d at 365 (quoting *McKee Elec. Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967)) (internal quotations omitted) (alterations in original). Section 302(a)(1) is a "single act statute" and "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transactions and the claims asserted here." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988). But, "[n]o single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *Cutco Indus.*, 806 F.2d at 365. "[I]t is the 'nature and quality', and not the amount of New York

---

**3.** Plaintiff has not advanced the argument that this Court may exercise jurisdiction over defendants under CPLR § 301.

contacts which determine the issue...." *PaineWebber, Inc. v. Westgate Group, Inc.*, 748 F.Supp. 115, 119 (S.D.N.Y.1990) (quoting *Standard Enter., Inc. v. Bag–It, Inc.*, 673 F.Supp. 1216, 1220 (S.D.N.Y.1987)); *George Reiner & Co., Inc. v. Schwartz*, 41 N.Y.2d 648, 651–52, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977); *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 457, 261 N.Y.S.2d 8, 209 N.E.2d 68, *cert. denied*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965).

A claim arises out of business activity in New York if there is "some articulable nexus between the business transacted and the cause of action sued upon." *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981). *See also Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir.1983) (holding that strong nexus is required also under the "contracts anywhere" clause). It is essential that the claim be a "direct consequence of purposeful New York activity and the benefits and protection of New York law have been utilized" by defendant. *Tonns v. Spiegel's*, 90 A.D.2d 548, 550, 455 N.Y.S.2d 125 (1982). With these standards in mind, I turn to the pleadings and evidentiary materials submitted by the parties to determine whether plaintiff has made a *prima facie* showing that defendants transacted business in New York.

BSC contends that BARC and K & K transacted business in New York in connection with the Purchase Agreement, and that Katt transacted business in New York in connection with the NC and Indemnification Agreements. BSC further contends that the agreements, the correspondence between the parties, and payments made under the agreements demonstrate defendants' purposeful contacts with New York. I disagree.

The agreements, correspondence, and payments support a contrary conclusion, namely that defendants purposely avoided contacts with New York. Significantly, the deal was closed and all relevant agreements were signed outside of New York, and all of the assets purchased by BSC are located outside of New York. Moreover, all negotiations were conducted by telephone or held at locations outside of New York. Significant activities relating to the sale occurred in Louisiana, Oklahoma, Wisconsin and Missouri, but none occurred in New York.

That BSC and its representatives were in New York during the telephone negotiations is jurisdictionally irrelevant. "New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York." *Beacon Enterprises*, 715 F.2d at 766. "[I]nterstate negotiations by telephone do not subject the communicants to the jurisdiction of the courts in the other states involved; nor do negotiations conducted by mail between a New York plaintiff and a nonresident defendant." *Plaza Realty Investors v. Bailey*, 484 F.Supp. 335, 346 (S.D.N.Y.1979).

Second, the deal was initiated by a representative of Crosman's parent company, PEXCO, a company located in Oklahoma. The representative, Pickett, contacted Katt in Wisconsin and expressed an interest in acquiring BARC. Defendants respond positively to the overture, but clearly they did not initiate the deal. *See Cooperstein v. Pan–Oceanic Marine, Inc.*, 124 A.D.2d 632, 507 N.Y.S.2d 893, (2d Dep't 1986) (relying on fact that defendant did not solicit business in New York but was instead contacted by plaintiff in finding no personal jurisdiction under § 302(a)(1)), *appeal denied*, 69 N.Y.2d 611, 517 N.Y.S.2d 1025, 511 N.E.2d 84 (1987). This was not a sale initiated by defendants with the intent to transact business with a corporation located in New York.

Third, according to Llewllyn Sale ("Sale"), the attorney who represented BARC, K & K, and Katt in the sale of assets to BSC, defendants expressly requested that the closing be held outside of New York. In the initial draft of the Agreement, BSC and Crosman included a provision stating that the closing would occur at Crosman's offices in New York. (Affidavit of Llewllyn Sale ("Sale Aff.") at ¶ 4). Sale asserts that he and the defendants objected to the closing being held in New York because it could have resulted in them being amenable to suit in New York. (*Id.*). Plaintiffs do not contest this. The Agreement was later amended to reflect that

the closing would occur in St. Louis, Missouri.

Fourth, according to Sale, at defendants' insistence a forum selection clause that would have made them subject to the exclusive jurisdiction of any state or federal court in New York was removed from the Final Agreement. Defendants contend, and BSC does not refute, that the initial draft of the Agreement contained such a forum selection clause, and that defendants requested that the clause, be omitted from the final Agreement. (Sale Aff. at ¶ 5).

As with all contracts, the intent of the parties controls. It is evident from the negotiations between the parties that defendants took clear and unequivocal steps to avoid activities that would subject them to jurisdiction in New York. Those acts are important and should be given weight in determining whether defendants are subject to being sued in New York.

Fifth, none of the payments owed under any of the agreements were required to be made in New York. *Cf. Cutco Indus.*, 806 F.2d at 368 (stating that notices and payments sent *to* the forum state are relevant for jurisdictional purposes because they subject senders to the supervision of the company in the forum state); *Cooperstein*, 124 A.D.2d 632, 507 N.Y.S.2d 893 (relying on fact that defendant did not send lend proceeds to New York in finding no jurisdiction). In fact, all payments due under the various agreements were owed by BSC to defendants outside of New York.

■ In contrast, only two factors support BSC's contention that defendants transacted business in New York: (1) the New York choice-of-law clauses in the various agreements; and (2) BSC's presence in New York. However, in light of the contrary evidence neither is sufficient to sustain even *prima facie* jurisdiction over defendants. A

choice-of-law clause, although relevant in determining whether a non-domiciliary 'transacted business' under § 302(a)(1), by itself is insufficient to confer jurisdiction over a non-domiciliary defendant. *Cutco Indus.*, 806 F.2d at 366–67. *See also Peter Lisec Glastechnische Industrie GmbH v. Lendhardt Maschinenbau GmbH*, 173 A.D.2d 70, 577 N.Y.S.2d 803 (1st Dep't 1991). Similarly, "the focus of a CPLR § 302 inquiry is on what defendant ... did in New York in connection with the cause of action," not what plaintiff did there. *PaineWebber, Inc.*, 748 F.Supp. at 119. A plaintiff may not rely solely upon his own activity in New York for purposes of § 302(a)(1) jurisdiction. *Laufer v. Ostrow*, 55 N.Y.2d 305, 312, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982).

Defendants did not purposefully avail themselves of the privilege of conducting business in New York, nor did they purposefully project themselves into the state. *Cf. Eugene Iovine, Inc. v. Rudox Engine & Equipment Co.*, 786 F.Supp. 236, 238–39 (E.D.N.Y.1992) ("Rudox's allegation that Horlick 'reached out' beyond Massachusetts to negotiate a contract with Rudox is not relevant to a § 302(a)(1) claim."). Indeed, a review of the totality of defendants' contacts with New York clearly reveals that defendants intentionally avoided conducting business in New York. Accordingly, I find that plaintiff has failed to establish *prima facie* jurisdiction over any of the defendants under the "transacts business" clause of CPLR § 302(a)(1).

### B. Contracts Anywhere to Supply Goods or Services

■ In a recent opinion, *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir.1993), the Second Circuit held that a financial guaranty payable in New York is a contract to perform services within the meaning of CPLR § 302(a)(1).[4] *Id.* at 81.

---

**4.** The contract at issue in *A.I. Trade* involved a financial guaranty of payment in what is referred to as a forfaiting transaction. Forfaiting involves the sale of goods or services for promissory notes or bills of exchange. *Id.* at 78. In such a transaction, the forfaiter finances the sale by paying the exporter and in return he receives the importer's promissory note. In addition, a guaran-

tor bank guarantees payment of the notes. Four parties participated in the initial forfaiting transaction in *A.I. Trade:* Nissilios Shipping Company of Greece, the importer, Welfin S.A. of Switzerland, the exporter, A.I. Trade Finance, Inc. of New York, the forfaiter, and Petra Bank of Jordan, the guarantor. Petra Bank, the defendant in the action, guaranteed payment of $15 million

Relying on *A.I. Trade*, BSC contends that this court should exercise personal jurisdiction over all three defendants because the indemnity agreements signed by defendants, like the financial guaranty in *A.I. Trade*, are contracts to supply services in New York within the meaning of CPLR § 302(a)(1). I disagree.

The guaranty at issue in *A.I. Trade* and indemnity agreements of the sort at issue here are fundamentally different contracts. Under an indemnity contract the liability assumed is primary, not secondary like the liability assumed under a contract of guaranty. *Assets Realization Co. v. Roth*, 226 N.Y. 370, 123 N.E. 743 (1919); N.Y.Jur.2d, Contribution, Indemnity, and Subrogation, § 8 (1992). The distinction is critical for purposes of our analysis because as the court in *A.I. Trade* noted:

> Courts applying 302(a)(1) to the underlying original obligation to pay money and courts applying 302(a)(1) to a guaranty have treated them differently. Some courts have held that a primary obligor's agreement to designate New York as a place of payment of its debt does not transform the debt into a contract to perform services in New York for jurisdictional purposes.

*A.I. Trade*, 989 F.2d at 81 (citing cases). Consequently, because defendants are primary obligors rather than secondary guarantors, *A.I. Trade* does not control the jurisdictional analysis in this action.

For jurisdictional purposes, an indemnity agreement, as a primary obligation, is akin to a promissory note, and "[i]t is well-settled that 'the mere designation of New York as the site for payment on a promissory note is insufficient to confer jurisdiction over a nonresident defendant.'" *First Federal Savings Bank v. Dennis*, 680 F.Supp. 579, 584 (S.D.N.Y.1988) (quoting *Plaza Realty Investors*, 484 F.Supp. at 346). *See also American Recreation Group, Inc. v. Woznicki*, 87 A.D.2d 600, 448 N.Y.S.2d 51 (2d Dep't 1982) (holding that agreement to pay promissory note in New York did not confer jurisdiction over defendant). Moreover, the indemnity agreements at issue here do not even require that payments be made in New York. Thus, no defendant is obligated to make any payments, or perform any other obligation, in New York. Accordingly, I find that plaintiff has failed to establish *prima facie* jurisdiction over any of the defendants under the "contracts anywhere" clause of CPLR § 302(a)(1).

Therefore, the fact that defendants agreed to indemnify BSC, standing alone, is insufficient to establish jurisdiction over defendants. *See Acres Int'l Corp. v. Moore Business Forms, Inc.*, 1988 WL 129367, *3 (W.D.N.Y.1988) (Elfvin, J.); *Media Corp. of America v. Motif Manufacturing Co., Inc.*, 524 F.Supp. 86, 87 (S.D.N.Y.1981). To confer jurisdiction over defendants BSC must offer proof that defendants engaged in additional activities in or relating to New York. *See First Federal Savings Bank*, 680 F.Supp. at 584.

However, as the discussion above reveals, BSC has offered no convincing evidence to support the conclusion that defendants availed themselves of the privilege of conducting activities in New York. The mere existence of the indemnity agreements does not change that fact.

Furthermore, indemnity agreements are quite standard in contracts of this type. It would be anomalous if insertion of such a clause in an agreement could by itself force the non-resident to submit to jurisdiction in New York. "The fulfillment of a duty to defend is not the kind of performance that makes one personally amenable to New York jurisdiction." *See Acres Int'l Corp.*, 1988 WL 129367, *3; *Media Corp.*, 524 F.Supp. at 87.

of promissory notes issued by Nissilios to Welfin, which specified on their face that they were payable in New York at Irving Trust Company. A.I. Trade then purchased the notes from Welfin. When the notes reached maturity, Petra Bank refused to honor its guarantee, and A.I. Trade sued. Petra Bank, a Jordanian company, moved to dismiss for lack of personal jurisdiction, and the district court granted the motion, and plaintiff appealed. On appeal, the Second Circuit reversed, and held that Petra Bank's financial guarantee of payment, which was made payable in New York, was a contract to provide services in New York that subjected Petra Bank to New York's long-arm jurisdiction.

Accordingly, I find that plaintiff has failed to establish *prima facie* jurisdiction over any of the defendants under the "contracts anywhere" clause of CPLR § 302(a)(1).

### III. *N.Y.Civ.Prac.L & R. § 302(a)(3)*

■ BSC also contends that this Court may exercise jurisdiction over defendants pursuant to CPLR § 302(a)(3). That section permits New York courts to exercise personal jurisdiction over a non-domiciliary, who in person or through an agent "commits a tortious act without the state causing injury to person or property within the state" if he, *inter alia*, "(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ..." N.Y.Civ.Prac.L. & R. 302(a)(3)(ii). The tortious act allegedly committed by defendants here is fraud, namely, making false representations and failing to disclose material information regarding critical aspects of the sale and manufacture of BARC airguns.

The parties do not dispute that the alleged tort occurred outside New York. Accordingly, the issue left to be resolved is whether BSC has made a *prima facie* showing that the remaining elements of § 302(a)(3)(ii) have been satisfied. BSC contends that the financial loss they suffered as a result of defendants tortious acts (the $4,000,000 paid under the Purchase Agreement) caused injury to them in New York, and that defendants should have foreseen the New York consequences of their actions because they knew that BSC was located in New York. I disagree.

"New York courts uniformly hold that the situs of a nonphysical, commercial injury is 'where the critical events associated with the dispute took place.'" *United Bank of Kuwait, P.L.C. v. James M. Bridges, Ltd.*, 766 F.Supp. 113, 116 (S.D.N.Y.1991) (quoting *Am. Eutectic Welding Alloy Sales Co. v. Dytron Alloy Corp.*, 439 F.2d 428, 433 (2d Cir.1971)). An injury "does not occur within the state simply because the plaintiff is a

resident. '[T]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.'" *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir.1990) (quoting *Carte v. Parkoff*, 152 A.D.2d 615, 616, 543 N.Y.S.2d 718 (2d Dep't 1989)), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). Thus, "the occurrence of financial consequences in New York due to the fortuitous location of the plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3)." *Pocahontas Supreme Coal Co., Inc. v. Nat'l Mines Corp.*, 90 F.R.D. 67, 73 (S.D.N.Y. 1981); *see also Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980).

If the rule were otherwise, any financial loss by a New York corporation could subject a non-domiciliary to jurisdiction in New York. Such a rule obviously places too much emphasis on the activities of and affects on the New York plaintiff rather than the actions of the non-domiciliary defendant.

In this case, the alleged misrepresentations and omissions were made outside New York, in New Orleans where the parties signed the Purchase Agreement and/or in St. Louis where the closing was held. BSC, through its representatives, was present at both locations where defendants committed the alleged fraud, and it signed the relevant agreements and closed the sale in reliance on the false representations and omissions outside of New York. Thus, New Orleans and/or St. Louis, not New York, constitute the original location of the event which caused the injury. Any financial consequences suffered by BSC in New York is due solely to the fortuitous location of BSC in that state.

BSC attempts to avoid the outcome of the application of these well-settled jurisdictional principles by equating this case with *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897 (2d Cir.1980).[5] This case, though, is distinguish-

---

5. In *Hargrave*, the plaintiffs, a New York vineyard and its president, commenced an action against a California corporation alleging six causes of action, including fraud. Plaintiffs ac- cused defendant of making fraudulent representations regarding the health of wine-grape vines that plaintiffs had agreed to purchase. Defendant allegedly represented that the vines were

able from *Hargrave*. In *Hargrave*, the court expressly relied on three factors in arriving at its conclusion that plaintiffs suffered injury in New York: First, the injury was immediately felt in New York because plaintiffs were domiciled there; second, plaintiffs were in New York when they received the misrepresentations; and third, the diseased vines were to be shipped to New York. *See Id.*, at 900. The court also noted that New York was the only state in which plaintiffs had property that could be injured. *Id.*

In contrast, in this case, BSC was in New Orleans and/or St. Louis when it received and relied on the misrepresentations and all of the property purchased by BSC is located outside of New York. Thus, the only similarity between *Hargrave* and this case is that plaintiffs in both cases were domiciled in New York. However, as the case law makes clear, merely being domiciled in New York is an insufficient basis upon which to sustain § 302(a)(3) jurisdiction. *See Mareno*, 910 F.2d at 1046. Accordingly, I find that BSC has failed to establish *prima facie* jurisdiction over any of the defendants pursuant to CPLR § 302(a)(3).

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss this action for lack of personal jurisdiction is granted, and the complaint is dismissed.

IT IS SO ORDERED.

healthy, however, contrary to these representations, the vines were diseased and incapable of bearing fruit of adequate quantity or quality. Defendant moved to dismiss the complaint for lack of personal jurisdiction. In response, plaintiffs relied on CPLR § 302(a)(3) and contended that defendant committed fraud in California that caused injury to plaintiffs in New York. The district court granted defendant's motion to dismiss, and plaintiffs appealed. The Second Circuit reversed, holding that plaintiffs had suffered injury in New York because it had lost the money it paid for the diseased vines.