**BANKERS TRUST COMPANY, Plaintiff–Appellant, Cross–Appellee,**

v.

**LEE KEELING & ASSOCIATES, INC., and Lee A. Keeling, Defendants–Appellees, Cross–Appellants.**

Nos. 92–5225, 92–5235.

United States Court of Appeals, Tenth Circuit.

April 5, 1994.

---

Steven M. Harris, Doyle & Harris, Tulsa, OK (Laura B. Hoguet, White & Case, New York City, with him on the briefs), for appellant/cross-appellee.

James L. Kincaid (Jeffrey T. Hills with him on the briefs), Crowe & Dunlevy, Tulsa, OK, for appellees/cross-appellants.

Before ANDERSON and BALDOCK, Circuit Judges, and KANE,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiff and appellant Bankers Trust Company ("BTC") appeals from the grant of defendant Lee Keeling's ("Keeling") Fed. R.Civ.P. 50(b) motion for judgment as a matter of law on BTC's claim of negligence and negligent misrepresentation in the preparation of certain oil and gas reserve reports, and from the grant of summary judgment for Keeling on BTC's "alter ego" claim against him. Keeling and codefendant Lee Keeling & Associates, Inc. ("LKA"), a firm of oil and gas engineering consultants, cross appeal, arguing the district court erred in ruling that New York law applied to this diversity case and in refusing to reduce BTC's judgment against LKA and Keeling by amounts which were paid to BTC by other entities. For the following reasons, we affirm.

## BACKGROUND

BTC is a banking corporation organized under the laws of New York and with its principal place of business in New York. Keeling is a petroleum engineer and an officer, director, shareholder and employee of LKA, a firm of petroleum consultants organized under the laws of Oklahoma and with its principal place of business in Tulsa, Oklahoma. Scandrill, Inc. is a Texas-based oil and gas company which, in the spring of 1982, sought a "reserve-based" energy loan to expand its operations. Its corporate parents, at the time of the events relevant to this lawsuit, were Scanoil, Inc., Scandinavian Trading Company ("STC"), and Volvo AB ("Volvo").

Scandrill representatives met with BTC representatives to explore the possibility of BTC making such a loan. Before making a loan, BTC required a borrower to furnish a report on the borrower's oil and gas reserves from an engineer satisfactory to BTC. Scandrill furnished to BTC an oil and gas reserve report, dated June 30, 1982 ("June

1982 Report"), which LKA had prepared for Scandrill. This Report appraised Scandrill's "proved" oil and gas reserves at $405,605,200 which, when discounted at 14% to present value, amounted to $196,273,510.

In September 1982, BTC loan officers Robert Turner and Drew Axtell, who worked in BTC's Energy Division in Houston, Texas, met in Tulsa with Keeling and Erhan Ozey, a petroleum engineer and employee of LKA, to discuss the June 1982 Report and to examine the data, maps, and other materials upon which the Report was based. Satisfied that the appraised reserves qualified under its formula for reserve-based loans, BTC agreed to lend $105,000,000 to Scandrill, secured solely by the properties appraised by LKA in the June 1982 Report. In a letter dated November 5, 1982, signed by Keeling, LKA authorized BTC to rely on the June 1982 Report as if the Report had been originally addressed to the Bank, not to Scandrill.

BTC and Scandrill thereafter closed the loan in New York on November 9, 1982. In accordance with the loan documentation, LKA furnished semi-annual reports to BTC providing updated information on the oil and gas reserves which served as the collateral for the loan. In March 1984, some sixteen months after the loan was made, Scandrill defaulted. Approximately a year later, BTC discovered that the June 1982 Report, as well as three subsequent reports prepared by LKA, dated December 1982, June 1983 and December 1983, all overstated the value of Scandrill's reserves. Evidence at trial suggested that the June 1982 Report overstated the value of those reserves by more than $100,000,000. In 1984 BTC acquired all of Scandrill's stock, in connection with a settlement agreement between BTC, Scandrill, and Scandrill's corporate parents, pursuant to which BTC released any claim it might have against Scandrill and others, but specifically reserved its right to sue LKA and Keeling.

BTC commenced this diversity action in the southern district of New York against

---

* John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation.

Keeling and LKA, claiming ordinary and gross negligence, negligent misrepresentation, breach of contract, breach of third party beneficiary contract and, against Keeling alone, liability as the alter ego of certain family business entities: Savannah Investment Co. ("Savannah"), an Oklahoma limited partnership; Columbia Development Corporation ("Columbia"), an Oklahoma corporation; and Palmco Management Company ("Palmco"), another Oklahoma corporation.[1] BTC alleged it lost approximately $51,000,-000 from the Scandrill loan transaction. On defendants' motion, the case was transferred to the northern district of Oklahoma.

The trial court granted Keeling's motion for summary judgment on BTC's breach of contract and breach of third party beneficiary claims against Keeling, and bifurcated the alter ego claim to await a determination of Keeling's liability.

The remaining claims were tried to a jury. The court determined that New York provided the substantive applicable law. At the close of BTC's case, and again after presentation of all evidence, Keeling moved for judgment as a matter of law under Rule 50(a). The court denied both motions. The jury subsequently returned a verdict for BTC and against Keeling and LKA for $18,-000,000 on the negligence and negligent misrepresentation claims. It found for LKA on the contract and third party beneficiary contract claims. The district court reduced the judgment to $7,200,000 in reliance on New York's comparative negligence statute and the jury's finding that Keeling and LKA were 40% negligent and BTC was 60% negligent. After adding pre-verdict and pre-judgment interest, the court entered judgment in favor of BTC in the amount of $12,409,441.25.

After entry of judgment, Keeling filed a motion for judgment as a matter of law under Rule 50(b), asserting there was insufficient evidence supporting the negligence and negligent misrepresentation verdicts against him individually. The district court abated

consideration of the motion until the bifurcated "alter ego" claim was tried. Keeling and LKA both filed a Motion for Order Amending the Court's Prior Ruling on Choice of Law and Amendment of Judgment to Incorporate Application of Oklahoma Law, and a Motion for Settlement Reduction. Keeling also filed a motion for summary judgment on the alter ego claim. The court granted his alter ego summary judgment motion, as well as his Rule 50(b) motion, concluding that there was "insufficient probative evidence" of Keeling's negligence or negligent misrepresentations concerning the reserve reports. The court denied Keeling's and LKA's motions regarding choice of law and settlement reduction. This appeal and cross appeal followed.

BTC argues that the district court erred in (1) granting Keeling's Rule 50(b) motion, because there was sufficient evidence from which the jury could conclude that Lee Keeling was personally involved in negligent acts; and (2) granting Keeling's motion for summary judgment on the alter ego claim. Keeling and LKA cross appeal, asserting that the court erred in applying New York law to the case and in refusing to reduce BTC's judgment by amounts paid to BTC by other entities.

## DISCUSSION

### I. Choice of Law

We consider first whether the district court erred in applying New York law to this case. In an interlocutory order dated January 23, 1992, the district court held that New York supplied the substantive applicable law. On November 2 it denied LKA's and Keeling's motion to reconsider that interlocutory order. All parties agree that New York's choice of law rules apply to resolve any conflict of laws issues in this case. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964). They disagree on the application of New York's choice of law rules to the facts of this case.

---

1. As explained more fully *infra*, BTC's alter ego claim against Keeling was not the typical alter ego claim. BTC essentially argued that Keeling used these family business entities to shield his assets from BTC's claims against him. Thus,

BTC claimed it should be able to satisfy any judgment against Keeling with assets from those family entities, none of which were named defendants in this case.

We begin by rejecting BTC's many arguments that LKA and Keeling have failed to properly preserve the choice of law issue for appellate review. The district court issued its choice of law decision in an interlocutory order. That order falls under "[t]he general rule ... that interlocutory rulings merge into the final judgment of the court and become appealable only once a final judgment has been entered." *Mock v. T.G. & Y. Stores*, 971 F.2d 522, 527 (10th Cir. 1992). We therefore address the merits of the district court's conclusion that New York's choice of law rules require the application of New York law to this case. We review that conclusion de novo, *Shearson Lehman Bros. v. M & L Invs.*, 10 F.3d 1510, 1514 (10th Cir.1993), applying the clearly erroneous standard to underlying factual findings. *Mitchell v. State Farm Fire & Cas. Co.*, 902 F.2d 790, 792 (10th Cir.1990).

To resolve choice of law issues in tort cases, New York employs an "interest analysis" so that "the law of the jurisdiction having the greatest interest in resolving the particular issue" applies to the case. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 595 N.Y.S.2d 919, 922, 612 N.E.2d 277, 280 (1993); *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95–96, 480 N.E.2d 679, 684 (1985); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 751–52, 191 N.E.2d 279, 285 (1963); *see also AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir.1992). "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz*, 491 N.Y.S.2d at 95–96, 480 N.E.2d at 684; *see also AroChem Int'l, Inc.*, 968 F.2d at 270; *Gray v. Busch Entertainment Corp.*, 886 F.2d 14, 15 (2d Cir.1989) (per curiam) ("[W]hen the domiciles of the parties differ, the location of the injury determines the

governing substantive law absent special circumstances."); *Flores v. Union Pacific R.R.*, No. 92 Civ. 6378, 1994 WL 22991, at *3–4, 1994 U.S.Dist. LEXIS 647, at *11 (S.D.N.Y. Jan. 26, 1994); *Mascarella v. Brown*, 813 F.Supp. 1015, 1018 (S.D.N.Y.1993).[2]

New York distinguishes, for purposes of choice of law, between "laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs (such as vicarious liability rules)." *Cooney*, 595 N.Y.S.2d at 922, 612 N.E.2d at 280. The laws in conflict in this case are Oklahoma's and New York's respective laws relating to damages allocations when there is contributory negligence. Laws relating to comparative negligence are loss-allocating. *Pascente v. Pascente*, No. 91 Civ. 8104, 1993 WL 43502, at *1, 1993 U.S.Dist. LEXIS 1779, at *2 (S.D.N.Y. Feb. 16, 1993); *Murphy v. Acme Mkts., Inc.*, 650 F.Supp. 51, 53 (E.D.N.Y.1986); *Cain v. Greater New York Council of the Boy Scouts of Am.*, 133 A.D.2d 243, 519 N.Y.S.2d 43, 44 (1987); *see also Diehl v. Ogorewac*, 836 F.Supp. 88, 92 (E.D.N.Y.1993) (availability of complete or partial defense to liability based on plaintiff's conduct is loss-allocating rule).[3]

Such loss-allocation conflicts are governed by a set of rules developed in *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 68–71, 286 N.E.2d 454, 457–58 (N.Y.1972), and subsequently applied in a number of loss-allocation conflict cases. *See, e.g., Cooney*, 595 N.Y.S.2d at 923–24, 612 N.E.2d at 281–82; *Schultz*, 491 N.Y.S.2d at 97–98, 480 N.E.2d at 686; *see also Barkanic v. General Admin. of Civil Aviation*, 923 F.2d 957, 963 (2d Cir.1991) ("[T]he only factors the New York Court of Appeals now considers relevant with respect to loss distribution issues are those factors incorporated in the three *Neumeier* rules.").

---

2. This case also involved contract claims—BTC's breach of contract and breach of third party beneficiary claims, on which the jury found for LKA and the district court granted Keeling's motion for summary judgment. New York applies a "center of gravity" or "grouping of contacts" analysis to choice of law disputes in contract cases. *In re Arbitration Between Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 907, 613 N.E.2d 936, 939 (1993). Neither party alleges any conflict between New York and Oklahoma law with respect to the contract claims.

3. Were we to conclude that comparative negligence rules were conduct-regulating, New York law would apply, as the New York courts have consistently held that the locus of the tort provides the applicable law when conduct-regulating laws conflict, and we hold, *infra*, that New York is the locus of the tort.

The first *Neumeier* rule governs cases where plaintiff and defendant share a common domicile and is therefore inapplicable to this case. The second and third *Neumeier* rules address "true conflicts" where the parties are domiciled in different states. The second *Neumeier* rule applies where the local state law favors its own domiciliary, and, to resolve that conflict, essentially "adopts a 'place of injury' test." *Cooney,* 595 N.Y.S.2d at 923, 612 N.E.2d at 281. The third *Neumeier* rule applies to all other split-domicile cases, and also "generally uses the place of injury, or locus, as the determining factor." *Id.* The law of the place where the injury occurred will only be displaced if " 'displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants.' " *Id.* (quoting *Neumeier,* 335 N.Y.S.2d at 71, 286 N.E.2d at 458).

Thus, in order to apply either the second or third *Neumeier* rules, we must first determine the place of the injury. "Under traditional rules, the law of the place of the wrong governs all substantive issues in the action, but when the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz,* 491 N.Y.S.2d at 93–95, 480 N.E.2d at 682–83 (citations omitted). The parties hotly contest this issue—Keeling and LKA argue that Oklahoma law applies because the reports containing the misrepresentations were prepared there, whereas BTC argues New York law applies because the "last events necessary to make" LKA and Keeling liable occurred in New York (the final decision to make the loan, the execution and closing of the loan, the disbursements pursuant to the loan, and the recording of the loss). We hold that the "place of the wrong" is New York.

The parties do not cite, nor does our research reveal, a New York case addressing the situation before us—i.e., where the tort is negligent misrepresentation allegedly committed by an Oklahoma domiciliary against a New York domiciliary. In particular, no New York cases clearly dictate where the wrong occurs in such a case, nor where the injury is suffered.

However, several federal district courts addressing similar problems guide us. In *Benjamin Sheridan Corp. v. Benjamin Air Rifle Co.,* 827 F.Supp. 171 (W.D.N.Y.1993), the court observed that "New York courts uniformly hold that the situs of a nonphysical, commercial injury is 'where the critical events associated with the dispute took place.' " *Id.* at 178 (quoting *United Bank of Kuwait v. James M. Bridges, Ltd.,* 766 F.Supp. 113, 116 (S.D.N.Y.1991) (quoting *American Eutectic Welding Alloy Sales Co. v. Dytron Alloy Corp.,* 439 F.2d 428, 433 (2d Cir.1971))). The *Benjamin* court went on to hold that the " 'situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.' " *Id.* (quoting *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991)).

Similarly, in *Sussman v. Bank of Israel,* 801 F.Supp. 1068 (S.D.N.Y.1992), the court stated that it "regarded the place where the victim of fraud or negligence suffered economic loss as less significant for choice of law purposes than the law of the place by which the defendant's conduct is evaluated." *Id.* at 1075; *see also Guildhall Ins. Co. v. Silberman,* 688 F.Supp. 910, 913 (S.D.N.Y.1988) ("[E]ven if [plaintiff's] alleged injury took place in New Jersey this contact is not a sufficient reason to apply New Jersey law in this action.").

Other courts addressing fraudulent misrepresentation claims have more closely followed the *Schultz* "last event necessary" rule and held that the locus of the last events necessary for such a claim—reliance on a false statement and the incurment of damages—determines the applicable law. *See, e.g., Globe Communications v. R.C.S. Rizzoli Periodici,* 729 F.Supp. 973, 976 (S.D.N.Y. 1990) (law of place where reliance and damages occurred applies); *Rosenberg v. Pillsbury Co.,* 718 F.Supp. 1146, 1150 (S.D.N.Y. 1989) ("The locus of a fraud is 'the place where the injury was inflicted,' as opposed to

the place where the fraudulent act originated.'") (quoting 19 N.Y.Jur.2d *Conflict of Laws* § 40 (1982)); *In re AM Int'l Sec. Litigation,* 606 F.Supp. 600, 609 (S.D.N.Y.1985) ("[W]here the jurisdiction of the alleged negligent conduct and that of the injury differ, the law of the place of injury generally governs."). Another court has focused on the place where "the misrepresentation is made and the parties have taken action in reliance thereon." *Crossland Sav. FSB v. Rockwood Ins. Co.,* 692 F.Supp. 1510, 1512 (S.D.N.Y. 1988). In *Crossland,* the alleged misrepresentations were made by a Texas attorney in connection with legal work performed for a Texas client, but the misrepresentations were made through documents provided to the injured party in New York, and, in reliance upon those misrepresentations, a transaction was closed in New York. The court held that New York law applied.

Finally, BTC urges us to follow *Federated Capital Corp. v. Florida Capital Corp.,* 280 F.Supp. 301 (S.D.N.Y.1968), in which the court held that New York law applied to the negligent misrepresentation claim of a New York domiciliary with its sole place of business in New York against a Florida corporation for damages resulting from misrepresentations which were "made and received both in Florida and New York." *Id.* at 302. In holding that New York had the greater interest in the litigation, the court observed that plaintiff's assets were "situated in or at least channeled through New York" and therefore the "burden of any financial loss to plaintiff would ... fall most heavily in New York." *Id.* at 302–03. In so holding, the court appears to have given greatest weight to the place of injury.

■ We believe that the cases which have attached the most significance to the place where the plaintiff has relied on the alleged misrepresentations and suffered resultant damages are most faithful to the *Schultz* "last event necessary" test, which the New York courts appear to still follow. Thus, although the reports themselves were prepared in Oklahoma, they were sent to BTC in New York and it was in New York that the final decision was made to issue the loan, in reliance on the reserve estimates in the reports. Further, despite arguments relating to where losses from the loan were placed for BTC's internal bookkeeping purposes, it seems self-evident that the loss was suffered by BTC in New York, its place of principal business and its headquarters, and under whose laws it was incorporated and is regulated.

■ Having determined the domiciles of the parties and the locus of the tort, we determine which *Neumeier* rule applies. We hold that the second *Neumeier* rule applies, because BTC was injured in the state of its own domicile, whose law—New York law—would permit recovery despite BTC's contributory negligence, and Keeling and LKA seek to interpose the law of their domicile—Oklahoma—which would shield them from liability. The second *Neumeier* rule prevents Keeling and LKA from using Oklahoma law as a shield "in the absence of special circumstances," *Neumeier,* 335 N.Y.S.2d at 70–71, 286 N.E.2d at 458, and mandates the application of New York law. *See Mascarella,* 813 F.Supp. at 1020. Keeling and LKA do not argue, nor can we discern, any "special circumstances" suggesting we should not apply New York law. Accordingly, New York law governs this case.

## II. *Settlement Reduction Under N.Y. Gen. Oblig. § 15–108*

■ Section 15–108 of New York's General Obligations Laws governs the situation where one of several tortfeasors settles with the plaintiff and obtains a release from liability. Specifically, the section does not release non-settling tortfeasors from liability, but it reduces the amount which the plaintiff may recover from them by the greater of: (1) the amount stipulated in the settlement; (2) the amount of consideration paid for the settlement; or (3) the released tortfeasor's equitable share of the damages. N.Y.Gen.Oblig. § 15–108(a). Additionally, the settling tortfeasor is "relieve[d] ... from liability to any other person for contribution" but is also prohibited from seeking contribution from any other tortfeasor. N.Y.Gen.Oblig. § 15–108(b), (c). The statute thus "establishes a quid pro quo arrangement: the settlor limits its liability but in exchange forfeits any right

to contribution." *Gonzales v. Armac Indus.,* 81 N.Y.2d 1, 595 N.Y.S.2d 360, 362, 611 N.E.2d 261, 263 (1993); *see also Orsini v. Kugel,* 9 F.3d 1042, 1046 (2d Cir.1993).[4] The statute applies to "concurrent, successive, independent, alternative, and even intentional tortfeasors." *Board of Educ. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 523 N.Y.S.2d 475, 478–79, 517 N.E.2d 1360, 1364 (1987).

Keeling and LKA argue they are entitled to a reduction of the judgment against them by an amount equal to the "amount stipulated" or the "consideration paid" to BTC by Scandrill and the other parties (Scandrill's corporate parents) to the settlement. This would result in no damages for BTC. The district court refused to order a settlement reduction, on the ground that Scandrill, Scanoil, STC, and Volvo were not joint tortfeasors along with LKA and Keeling. The court further observed that there was no danger of double recovery by BTC in the absence of a settlement reduction, because BTC had restricted its claim to the amount it lost pursuant to the Scandrill loan minus the amount it received pursuant to the settlement.

We agree with the district court and BTC that LKA and Keeling are not entitled to a reduction under section 15–108. "General Obligations Law § 15–108 applies only to contribution claims in tort actions." *Gonzales,* 595 N.Y.S.2d at 363, 611 N.E.2d at 264; *see also Sargent,* 523 N.Y.S.2d at 477–78, 517 N.E.2d at 1363. Indeed, by its terms, it applies to joint "tortfeasors"—"persons liable or claimed to be liable in tort" for an injury. BTC and Scandrill had a contract, which Scandrill breached, and with respect to which BTC, Scandrill, and Scandrill's corporate parents reached a settlement. BTC has never brought a tort action against Scandrill or the other parties to the settlement, nor has LKA or Keeling ever attempted to implead them in the tort action between BTC and LKA and Keeling. Thus, they simply are not joint tortfeasors within the meaning of the statute.

Moreover, we agree with the district court that the jury was specifically instructed that any award of compensatory damages to BTC from Keeling and LKA could only be for damages for which BTC had not already been compensated. The jury heard testimony and received evidence relating to the settlement agreement and its terms. "Because the jury's compensatory award did not take into account plaintiff's injuries attributable to the settling codefendants, [nonsettling defendants] may not invoke § 15–108 to decrease their liability for compensatory damages by virtue of these settlements." *Getty Petroleum Corp. v. Island Transp. Corp.,* 862 F.2d 10, 16 (2d Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989).

### III. *Grant of Keeling's Rule 50(b) Motion*

BTC argues that the district court erred in granting Keeling's Rule 50(b) motion on the ground that there was insufficient evidence supporting the jury's finding that Keeling individually had been negligent or made any negligent misrepresentations to BTC. We affirm.

In diversity cases, the sufficiency of the evidence to go to the jury is a matter of federal procedural law. *McKinney v. Gannett Co.,* 817 F.2d 659, 663 (10th Cir.1987); *FDIC v. Palermo,* 815 F.2d 1329, 1335 (10th Cir.1987). However, while federal law provides "the procedural measure of the sufficiency of the evidence, [state] law on negligence provides the substantive measure." *Grasmick v. Otis Elevator Co.,* 817 F.2d 88, 90 (10th Cir.1987); *see also Palermo,* 815 F.2d at 1335. We review the district court's order sustaining Keeling's motion for judgment as a matter of law under Rule 50 de novo, applying the same standard as the district court. *Fry v. Board of County Comm'rs,* 7 F.3d 936, 938 (10th Cir.1993). "The question then is whether there was evidence upon which the jury could return a

---

4. Keeling and LKA erroneously charge the district court with placing "undue emphasis on contribution." Appellees' Br. at 27. Sections (b) and (c) of section 15–108 play an integral role in the statute's scheme: " '§ 15–108 was enacted

as one unit and cannot logically be construed to permit one but not others of its subdivisions to apply in a given case.' " *Orsini,* 9 F.3d at 1046 (quoting *Cover v. Cohen,* 113 A.D.2d 502, 497 N.Y.S.2d 382, 388 (1985)).

verdict against [Keeling]." *Id.* A "scintilla" of evidence, however, is not enough to justify submission of a case to a jury. *Adams–Arapahoe School Dist. No. 28–J v. GAF Corp.*, 959 F.2d 868, 874 (10th Cir.1992).

As we have previously indicated, the district court applied New York law concerning negligence and negligent misrepresentation, and no one disputes the propriety of that application.[5] Business Corporations Law § 1505 provides that a "shareholder, employee or agent of a professional service corporation shall be personally and fully liable ... for any negligent ... act ... committed by him or by any person under his direct supervision and control." N.Y.Bus.Corp. § 1505. We agree with the district court that there is insufficient evidence to support the jury's

finding that Keeling acted negligently or made any negligent misrepresentation concerning the reserve reports.

■ As indicated, LKA prepared four reserve reports. BTC stipulated in the pretrial order that Keeling did not himself prepare or supervise the preparation of the first report—the June 1982 Report—the Report upon which BTC relied in deciding to make the loan to Scandrill: "The June 30, 1982 LKA Report on Scandrill reserves was prepared by Erhan Ozey under the supervision of Kenneth Renberg." Joint Pretrial Order ¶ 11; Appellant's App. Vol. I at 64. Testimony at the trial supported the conclusion that Keeling did not himself prepare or supervise that preparation of the June 1982 Report.[6]

---

5. The parties have argued that a conflict existed between New York's and Oklahoma's contributory negligence loss-allocating rules, and we have held that New York law applies. The parties have not argued that any conflict exists between New York and Oklahoma law on the substantive elements of negligence or negligent misrepresentation, and they do not challenge the district court's application of New York law.

6. Renberg testified as follows:
Q: Mr. Renberg, you supervised the preparation of the June 30, 1982 evaluation report for Scandrill; isn't that right?
A: Yes, sir.
Q: And isn't it a fact that you and Mr. Keeling worked interchangeably in connection with the preparation of that report?
A: *Not of that report, no, sir.*

.   .   .   .   .

A: [by Mr. Renberg] I do remember, vaguely, but as I recall, *I was involved in the first three reports, Mr. Keeling was more involved in the second—in the fourth report.*
Appellant's App. Vol. II at 572–76 (emphasis added). BTC's counsel attempted to impeach Renberg's trial testimony with his deposition testimony, in which Renberg had testified as follows:
Question: The June 30th, '82 report, the 12/31/82 report, the June 30th, '83 report, and the 12/31/83 report, I'm trying to understand what Mr. Keeling's involvement was in connection with the preparation and publication of those various reports.
Answer: He was involved. I don't really recall to what extent.
Question: Would it be fair to say that Mr. Ozey worked with Mr. Keeling at times and worked with you at other times?
Answer: No. Mr. Keeling and I, kind of worked interchange more or less. We worked more or less ably, depending on who was

available. And I think I probably looked more at the reserves than he did.
Question: When you say that you and Mr. Keeling worked interchangeably, could that explain certain areas that you do not have a recollection about in that it's possible that Mr. Keeling performed the review function as to certain elements and you performed a review function of other elements?
Answer: As I recall, *he was more involved in the December '83 report than I was.*
Question: All right. But *with respect to the first three reports, ignoring for a moment the last report.*
Answer: *I think I probably was more involved there than he was.*
Question: Now, can you describe for me the nature or type, even though it may have been less than your involvement, can you give me an illustration or your recollection, perhaps, of just exactly what Mr. Keeling's involvement was in the review and evaluation of Mr. Ozey's work for those first three reports: June of '82, December '82, June 1983?
Answer: *I really don't recall.*
*Id.* at 573–74 (emphasis added).
Robert Turner, one of the BTC loan officers who met with Keeling and Erhan Ozey to review the June 1982 Report to determine whether the reserve estimates would support the loan to Scandrill, testified as follows about Keeling's involvement in that meeting:
A: [A]fter we received the midyear 1982 report, Mr. Axtell and myself went to Tulsa, to the offices of Lee Keeling & Associates and met with Mr. Keeling and Mr. Erhan Ozey.... We ... held discussions with Mr. Keeling and Ozey concerning the information contained....

.   .   .   .   .

Q: Can you differentiate what Mr. Keeling told you in connection with the 6/30/82 report and what Mr. Ozey told you?

Additionally, several internal BTC memoranda, introduced into evidence at trial, refer to Erhan Ozey as the LKA engineer for the Scandrill account. Appellees' Supplemental App. Vol. I at 63, 126. That testimony and evidence indicates that the June 1982 Report was prepared by Ozey, under Renberg's supervision, and that both Keeling and Ozey were present at the meeting with BTC loan officers at which the Report was discussed and reviewed. There is no evidence that Keeling made any particular representations or misrepresentations at that meeting.[7] In short, the jury's finding that Keeling was negligent in connection with the June 1982 Report's preparation, or made negligent misrepresentations respecting that Report to BTC, could only have been based on speculation and conjecture, an impermissible ground upon which to base its verdict. *See Lucas v. Dover Corp.,* 857 F.2d 1397, 1401 (10th Cir. 1988) (affirming grant of judgment n.o.v., court stated it is " 'not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones.' ") (quoting *Matthews v. Allis–Chalmers,* 769 F.2d 1215, 1218 (7th Cir.1985) (per curiam)).

The evidence is similarly lacking with respect to the other three reports. Renberg's testimony clearly indicates that Keeling was involved in the preparation of the December 1983 Report, but not in the previous three reports. And while the jury was instructed it could consider all four reports in connection with the negligence and negligent misrepresentation claims, the record contains no specific evidence of negligence or negligent misrepresentations by Keeling regarding the December 1983 Report, nor evidence that BTC relied on the report to its detriment.[8]

We therefore affirm the district court's grant of Keeling's Rule 50(b) motion for judgment as a matter of law on the claims of individual liability for negligence and negligent misrepresentation. Because we affirm that ruling, we need not address the alter ego claim, which requires a predicate finding of personal liability by Keeling. We deny BTC's motion to supplement the record on appeal.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

A: No, that would be impossible to go back and say Mr. Keeling presented this particular area and Mr. Ozey this particular area. I can't, I don't think there's any possibility that they would do that.
Q: Was Mr. Keeling an active participant in the discussion?
A: Yes, from time to time, I believe there were certain areas that Mr. Keeling would answer our questions on certain areas, or Mr. Ozey, or they would perhaps answer jointly on some.
Q: Did Mr. Keeling express to you what he did in connection with the preparation of the 6/30/82 report?
A: No. There was no expression as to who did what.
*Id.* at 555, 565–66.
Erhan Ozey's deposition testimony stated that he alone calculated the reserves for the June 1982 and the December 1982 Reports. *Id.* at 581.

7. While BTC attaches great significance to the fact that Turner and Axtell were given a work sheet prepared by LKA at the meeting, in order to facilitate their review of the Report, there is no evidence that Keeling himself had anything to do with the preparation of the work sheet, or that he made any specific representations concerning it.

8. BTC argues that Keeling has waived any argument relating to negligent preparation of the December 1983 Report, because he failed to make a Rule 50 motion on the sufficiency of the evidence regarding that Report, and he failed to object to the jury instruction permitting the jury to consider all four reports. However, Keeling's Rule 50(b) motion for judgment as a matter of law, made after the jury returned its verdict, specifically argues that there was no evidence that he had committed negligence with respect to *any* report. Keeling's earlier motion for judgment as a matter of law similarly asserted that there was no evidence that he had negligently prepared or made a negligent misrepresentation regarding any report. Keeling has sufficiently preserved that issue for appellate review.