76 F.3d 1118
 LYON DEVELOPMENT COMPANY, a New Mexico corporation; Jeanne
Lyon, doing business as Lyon and Associates
Realty, Plaintiffs-Counter-Defendants-Appellants,
v.
BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA, a Missouri
corporation, Defendant-Counter-Claimant-Appellee.
 Nos. 94-2202, 95-2000 and 95-2096.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 14, 1996.
 
 Joseph W. Halpern and Heather R. Hanneman of Holland & Hart, Denver, Colorado, and Randolph B. Felker and Mariana G. Geer of Felker, Ish, Hatcher, Ritchie, Sullivan & Geer, Santa Fe, New Mexico, for Lyon Development Co. and Jeanne Lyon d/b/a Lyon and Associates Realty.
 Bruce Hall, Edward R. Ricco and David C. Davenport, Jr., of Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, New Mexico, and James O. Browning of Browning & Peifer, Albuquerque, New Mexico, for Business Men's Assur. Co. of America.
 Before BRISCOE and LOGAN, Circuit Judges, and THOMPSON,* District Judge.
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiff Lyon Development Company (LDC) appeals from the district court's entry of a judgment in favor of Business Men's Assurance Company of America (BMA) on LDC's claims of breach of contract, breach of fiduciary duty, and economic compulsion, and on BMA's counterclaims against LDC. LDC also appeals the court's trial rulings regarding ambiguity in the guaranty agreement, parol evidence, and jury instructions, arguing that the jury's verdicts cannot be reinstated because of trial errors. Plaintiff Lyon & Associates Realty (LAR) appeals the court's refusal to instruct the jury on some of its claims.[1]
 
 
 2
 * LDC is a corporation owned and operated by Gary and Jeanne Lyon. The Lyons also operate LAR as a proprietorship. In 1985, Jeanne Lyon obtained an option to purchase a large undeveloped tract of land in Santa Fe, New Mexico. Although she and her husband envisioned developing a retirement resort community on the land, they did not have the resources to exercise the option or finance the development. The Lyons approached BMA, a large insurance company, to seek its participation in the project.
 
 
 3
 BMA and LDC formed a Missouri partnership, Quail Run Partners, to purchase, develop, and sell the property. Their partnership agreement included a mandatory buy-sell provision, under which one partner could make an offer to buy the second partner's interest and the second partner had the choice whether to sell its interest or purchase the offeror's interest at the same price. The buy-sell provision required the purchasing partner to reimburse certain capital contributions, and to indemnify the selling partner for any obligations arising out of participation in the partnership.
 
 
 4
 The partnership agreement also designated LAR as the exclusive real estate broker authorized to sell the Quail Run units. LDC agreed to be solely responsible for marketing costs, and agreed to reimburse the partnership for any amounts advanced for this purpose by December 31, 1987. In addition, BMA and LDC entered into a separate development agreement, whereby the Lyons agreed to supervise the project development and to maintain financial records for a fee of $12,000 per month.
 
 
 5
 The partnership obtained financing from the Toronto-Dominion Bank (Lender). To protect the Lender's investment, the partners each guaranteed the partnership loan. The guaranty agreement contained a number of covenants and restrictions, including the following:
 
 
 6
 So long as any of the Guaranteed Obligations is outstanding ... and unless the Lender shall otherwise consent in writing:
 
 
 7
 ...
 
 
 8
 * * *
 
 
 9
 BMA and LDC hereby agree with each other and with the Lender that, anything in the Partnership Agreement to the contrary notwithstanding (i) so long as any Guaranteed Obligations remain outstanding, neither Guarantor will take any action that may result in dissolution of the Borrower.
 
 
 10
 I App. tab 2 at 98-99. The initial loan to the partnership was fifteen million dollars, with the option to borrow an additional ten million in the future.
 
 
 11
 From the beginning, construction on the Quail Run project was plagued with delays, cost overruns, changes in plans, liens, and controversy. Friction soon developed between BMA and the Lyons, and their relationship deteriorated throughout 1987. On October 27, 1987, as the initial $15,000,000 loan was nearing exhaustion, BMA tendered an offer to buy LDC's partnership interest for $100,000. Although the Lender initially viewed BMA's exercise of the buy-sell provision as contrary to the guaranty, it later fully consented to the transaction.
 
 
 12
 The partnership agreement provided that LDC had thirty days from the date of BMA's offer to decide whether to sell its partnership interest or to buy BMA's interest. To give LDC more time to find another partner, and to provide for interim financing of the project, LDC and BMA entered into a modification agreement. Under this agreement, LDC had until March 1, 1988, to respond to BMA's offer, and BMA agreed to recontribute its $3,150,000 preferred capital contribution into the project.
 
 
 13
 Shortly before its response time was to expire, LDC brought this action against BMA, alleging that BMA's exercise of the buy-sell provision, its course of dealing, and its refusal to seek additional financing from the Lender, constituted breach of contract, breach of fiduciary duty, and economic compulsion. LAR also claimed that BMA's actions made it impossible for LAR to carry out its duties under the exclusive listing agreement and thus breached the contract. BMA counterclaimed against LDC for breach of contract and breach of fiduciary duty.
 
 
 14
 In 1992, the district court granted partial summary judgment in favor of BMA, finding that BMA's exercise of the buy-sell provision was valid in all respects. On appeal, we reversed, holding that the validity of BMA's conduct could not be determined without first developing the facts surrounding LDC's claims for breach of contract, breach of fiduciary duty, and economic compulsion. See Lyon Dev. Co. v. Business Men's Assurance Co., No. 92-2264, 1993 WL 483049 (10th Cir. Nov. 24, 1993).
 
 
 15
 On remand, the case was tried before a jury. At trial, the district court determined, as a matter of law, that the partnership, guaranty, and modification agreements were not ambiguous. Because the guaranty agreement, by its terms, did not require the individual partners' consent before the buy-sell provision could be exercised, the court limited LDC's theories of the case and prohibited the admission of certain evidence.
 
 
 16
 The jury returned a verdict in favor of BMA on all of LDC's and LAR's claims. The jury also found that LDC had breached its contract with BMA, but awarded BMA only a dollar on its counterclaims. This is in accord with BMA's request, except for one claim for compensatory damages of $176,094 for marketing expenses loaned to LDC. The district court then granted BMA's motion for a judgment as a matter of law on all of the parties' claims and counterclaims, issuing an extensive Rule 50(b) judgment. Finding that no reasonable jury could have returned a verdict against BMA on its claim of breach of contract for marketing advances, the court awarded BMA $176,094 in damages as a matter of law and later awarded interest on that amount.
 
 
 17
 This case was premised on diversity jurisdiction, therefore we apply the substantive law of the forum state. See Perlmutter v. United States Gypsum Co., 54 F.3d 659, 662 (10th Cir.1995). Procedural issues, however, are governed by federal law. Id. The appropriateness of a Rule 50 judgment as a matter of law is a federal procedural issue which we review de novo, applying the same standard as the district court. Magnum Foods, Inc. v. Continental Casualty Co., 36 F.3d 1491, 1503 (10th Cir.1994); Bankers Trust Co. v. Lee Keeling & Assocs., 20 F.3d 1092, 1099 (10th Cir.1994).
 
 
 18
 Federal Rule of Civil Procedure 50(b) sets forth the "procedures to be followed ... as a prerequisite to entry of judgments notwithstanding an adverse jury verdict." Johnson v. New York, N.H. & H.R. Co., 344 U.S. 48, 51, 73 S.Ct. 125, 127, 97 L.Ed. 77 (1952). The rule, which permits a party to resurrect its earlier motion for judgment as a matter of law after an adverse verdict, was drafted to accommodate Seventh Amendment concerns. See id. at 51-53, 73 S.Ct. at 127-128 and cases cited therein. The rule does not permit a party in whose favor the verdict was rendered to renew its motion because "a jury verdict for the moving party moots the issue." See Notes of Advisory Committee on Rules, 1991 Amendment to Subdivision (b). If the court's Rule 50(b) judgment analysis was correct the issues should not have gone to the jury. But we need not analyze the district court's post-trial order insofar as it supports the jury's verdict unless we find error in the jury instructions and trial rulings of which LDC and LAR complain. Because we perceive no such error we only discuss the district court's post-trial ruling insofar as it overturns the jury's verdict on BMA's counterclaim to recover the $176,094 it loaned to LDC for marketing expenses. We note that there is considerable overlap between LDC's and LAR's complaints against the district court's Rule 50(b) analysis and their complaints against its rulings and instructions to the jury.
 
 II
 
 19
 We first consider plaintiffs' contract claims against BMA. Both the partnership and guaranty agreements purport to designate a particular state's substantive law for use in construing and enforcing the contracts. As a federal court sitting in diversity, the district court correctly looked to the forum state's choice of law provisions to determine the effect of such contractual designations. Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc., 24 F.3d 125, 128 (10th Cir.1994). Because New Mexico recognizes the validity of contractual choice of law provisions, see Stevenson v. Louis Dreyfus Corp., 112 N.M. 97, 811 P.2d 1308, 1309 (1991); Jim v. CIT Fin. Servs. Corp., 87 N.M. 362, 533 P.2d 751, 753 (1975), the substantive law of Missouri governs the partnership agreement and its modification, and New York law governs the guaranty agreement. We review the district court's determinations of state law de novo. Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).
 
 
 20
 * LDC argues that the district court erred in finding the guaranty unambiguously authorized exercise of the buy-sell provision without LDC's consent, and that, therefore, the guaranty did not amend the partnership agreement. It argues that the guaranty agreement can, and should, be construed to prohibit either partner from invoking the buy-sell provision without obtaining consent from both the lender and the other partner, so long as the partnership loan remained outstanding. LDC also argues that whether or not the guaranty was ambiguous, parol evidence should have been admitted to aid in its construction.
 
 
 21
 Whether an agreement is ambiguous is a question of law. W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990). Ambiguity is determined by examining whether, without reference to extrinsic evidence, "the agreement on its face is reasonably susceptible of more than one interpretation." Chimart Assocs. v. Paul, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231, 233 (1986). The contract must be read as a whole to determine its purpose and intent. W.W.W. Assocs., 565 N.Y.S.2d at 443, 566 N.E.2d at 642.
 
 
 22
 An examination of the guaranty makes it clear that it was written solely for the benefit of the Lender, and that the Lender's consent is the only consent necessary to authorize dissolution of the partnership. Beginning with the preamble, the agreement states that the purpose of the guaranty is "to induce the Lender to enter into the Loan Agreement." I App. tab 2 at 89. Each set of covenants in the guaranty, including the article containing the section upon which LDC relies, expressly permits the Lender to consent, in writing, to certain actions, including dissolution of the partnership. See id. at 98-99 ("unless the Lender shall otherwise consent in writing ... BMA and LDC hereby agree with each other and with the Lender that, anything in the Partnership Agreement to the contrary notwithstanding, ... neither Guarantor will take any action that may result in dissolution of the Borrower"). The absence of a parallel consent provision for the individual partners seriously undermines LDC's argument that this provision requires its consent before the partnership could be dissolved. See W.W.W. Assocs., 565 N.Y.S.2d at 443-44, 566 N.E.2d at 642-43.
 
 
 23
 The language "agree with each other" does not require a contrary conclusion. Rather, the agreement must be read to mean exactly what it says: that despite the unconditional rights contained in the partnership agreement, the partners agree with each other not to act to dissolve the partnership without obtaining the Lender's consent.
 
 
 24
 The overall purpose of the guaranty also negates LDC's proffered interpretation. In light of the clear intent to protect the Lender, it would be illogical to give one partner veto power over a course of action that the Lender deemed to be in its best interest. Partnerships are relationships dependent upon mutual continuing consent between the partners, terminable at any time one party chooses not to continue. LDC and BMA recognized this explicitly in the buy-sell provision in their partnership agreement. It would be too much of a stretch to read the provision at issue here, written for the benefit of the Lender, to be intended to negate that principle. Based on the clear language and purpose of the guaranty, the agreement is not reasonably susceptible of an interpretation requiring LDC's consent before the partnership may be dissolved. The district court did not err, therefore, in determining that the guaranty was unambiguous and that it did not modify the partnership agreement.[2]
 
 B
 
 25
 LDC argues that the court erred in excluding testimony by attorney Ralph Scheuer about the meaning of the guaranty and in excluding former drafts of the agreement. Because the guaranty is unambiguous on its face, however, the district court did not err in excluding such extrinsic evidence. See W.W.W. Assocs., 565 N.Y.S.2d at 443, 566 N.E.2d at 642; Chimart Assocs., 498 N.Y.S.2d at 346, 489 N.E.2d at 233; Wells v. Shearson Lehman/American Express, Inc., 72 N.Y.2d 11, 530 N.Y.S.2d 517, 524, 526 N.E.2d 8, 15 (1988). Further, LDC's evidence could not be admitted simply to aid in the guaranty's interpretation because it contradicted the agreement's unambiguous terms.
 
 
 26
 In any event, attorney Scheuer's testimony was properly excluded as a legal opinion on the meaning of the guaranty provision. It is uncontradicted that he did not draft the disputed language, did not negotiate with BMA about the guaranty's effect on the buy-sell provision, and was simply offering his interpretation of the contract language.
 
 C
 
 27
 LDC also argues that the court erred in refusing to admit extrinsic evidence regarding the modification agreement. Specifically, LDC argues that attorney Bruce Garber should have been permitted to testify regarding negotiations contemporaneous with the signing of the modification agreement in which Garber announced that none of the parties were waiving any claims they might have by signing the modification. The district court disallowed this because it found no ambiguity in the modification agreement. On appeal, LDC has not demonstrated that this ruling was erroneous.
 
 
 28
 The modification agreement itself is silent as to its effect on existing claims of the parties. Silence on a subject does not create an ambiguity within a contract. See Bank of Kirksville v. Small, 742 S.W.2d 127, 133 (Mo.1987). "A contract cannot be said to be ambiguous ... when none of its provisions are pointed to that do not have a clear meaning." Id. Because the modification agreement is unambiguous, parol evidence was not admissible to add an unwritten term regarding nonwaiver. See id.; State Bank v. Omega Elecs., Inc., 634 S.W.2d 234, 237-38 (Mo.Ct.App.1982) (holding that when agreement silent on signators' capacity, parol evidence inadmissible concerning representative capacity). For the same reason, the court did not err in excluding a former draft of the modification agreement.
 
 III
 
 29
 LDC and LAR argue that the district court erred in refusing to instruct the jury on all of their claims, and by giving a superfluous instruction regarding the scope of LDC's economic compulsion claim. Although state law governs the substance of a jury instruction in a diversity case, the decision to give an instruction is procedural and is therefore controlled by federal law. Holt v. Deere & Co., 24 F.3d 1289, 1292 (10th Cir.1994). We review the district court's jury instruction decisions for an abuse of discretion. See Green v. Denver & Rio Grande W. R.R., 59 F.3d 1029, 1034 (10th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 565, 133 L.Ed.2d 490 (1995).
 
 
 30
 LDC proposed jury instructions that set out its theory that BMA's exercise of the buy-sell provision, without its consent, breached both the guaranty and partnership agreements. Because the agreements did not prohibit such action the district court did not abuse its discretion in refusing the instructions.
 
 
 31
 Similarly, the district court did not abuse its discretion in refusing to give LAR's theory-of-the-case instructions that BMA breached its agreements with LAR, LDC, and the Lyons, thereby rendering LAR's performance under the partnership agreement impossible. Missouri law provides that "where one party to a contract forbids or interferes with the performance by the other party to an extent which amounts to a refusal to perform, the party interfered with may recover as if the contract had been performed." Gruhala v. Lacy, 559 S.W.2d 286, 289 (Mo.Ct.App.1977). Here, however, LAR did not show that BMA prevented it from continuing as the exclusive real estate broker for Quail Run. In fact, it is undisputed that BMA requested LAR on several occasions to continue in this role, that LAR continued to operate as realtor for almost six months after BMA tendered the buy-sell offer, and that it was LAR's decision to repudiate the exclusive listing agreement.
 
 
 32
 Because the evidence would not permit a jury to find that BMA rendered LAR's performance impossible, there was no abuse of discretion in refusing its impossibility instructions. Further, even assuming that the impossibility doctrine encompasses this situation, the failure to give LAR's instructions was harmless in light of the jury's verdict that BMA did not breach any of its duties to LDC.
 
 
 33
 The court's instruction that LDC entered into the partnership and guaranty agreements freely and without economic compulsion was neither improper nor prejudicial. The instruction, narrowing LDC's economic compulsion claim to the modification agreement, reflects the court's concern that the jury might have been confused by certain evidence regarding the other agreements. As LDC did not claim that it was economically compelled to enter into the partnership or guaranty agreements, this was not an abuse of the court's discretion, nor did it prejudice LDC.
 
 
 34
 Similarly, the court's refusal to instruct the jury as to LDC's theory of waiver was not an abuse of discretion. Under Missouri law, a waiver is defined as[t]he intentional relinquishment of a known right, on the question of which intention of the party charged with waiver is controlling, and if not shown by express declarations but implied by conduct, there must be a clear, unequivocal, and decisive act of the party showing, such purpose, and so consistent with intent to waive that no other reasonable explanation is possible.
 
 
 35
 Errante v. Kadean Real Estate Serv., Inc., 664 S.W.2d 27, 29 (Mo.Ct.App.1984). LDC has not shown the existence of a clear, unequivocal and decisive act by BMA showing an intent to waive LDC's contract breaches. The fact that BMA doubted LDC's ability to perform its duties does not mean that BMA waived LDC's failure to meet its responsibilities. BMA's failure to notify LDC of the breaches also does not show that such breaches were waived. As LDC has not directed our attention to any other evidence in support of its waiver defense, the failure to instruct the jury about its theory of waiver was not an abuse of discretion.
 
 IV
 
 36
 We turn finally to the district court's Rule 50(b) judgment overturning the jury's verdict on BMA's counterclaim for $176,094 loaned to LDC for marketing expenses. All that the court's judgment states concerning this claim is as follows:
 
 
 37
 Under section 8.3 of the partnership agreement, BMA loaned to LDC $176,094. The intent of this loan was for LDC to lend the funds to Lyon Realty to cover the costs of marketing the project. Lyon Realty did not have the capital to cover the costs of the marketing. However, it was the ultimate responsibility of Lyon Realty, and not the partnership, to pay the costs of the marketing under section 8.1 of the partnership agreement. Under section 8.3 of the Partnership agreement, LDC had until December 31, 1987, to repay the $176,094. LDC has failed to repay any portion of the $176,094 loan.
 
 
 38
 II App. tab 18 at 551.
 
 
 39
 LDC breached Section 8.3 of the partnership agreement by failing to repay BMA a loan in the amount of $176,094 on or before December 31, 1987. BMA's exercise of the buy-sell agreement did not relieve LDC of its breach.
 
 
 40
 Id. at 557.
 
 
 41
 [T]he Court finds that no reasonable jury could have returned a verdict against BMA on its claim of breach of contract for marketing advances and damages in the amount of $176,094. Therefore, the Court grants BMA's motion for judgment as a matter of law and awards BMA damages in the amount of $176,094.
 
 
 42
 Id. at 558. LDC asserts that this ruling was error. A judgment as a matter of law is appropriate only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue." Fed.R.Civ.P. 50(a); see Bankers Trust Co., 20 F.3d at 1099-1100.
 
 
 43
 We have an initial question whether the district court had jurisdiction to entertain a Rule 50(b) motion on this issue: on the face of the record the jury found for BMA; it returned a general verdict that LDC had breached contractual duties, and awarded one dollar in damages. If the jury verdict was indeed favorable to BMA, the district court's grant of the Rule 50(b) motion increasing the damages award from one dollar to $176,094 is equivalent to an additur. Although courts in some states are permitted to require defendants to choose either a court-increased verdict or a new trial, the Supreme Court in Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935), determined that additur cannot be used in the federal courts because it involves an unconstitutional reexamination of the jury verdict in violation of the Seventh Amendment. Of course, the district court does have the power to order a new trial on damages when the verdict is favorable to a party who asserts the damages were inadequate. See Estes v. Southern Pac. Transp. Co., 598 F.2d 1195, 1199 (10th Cir.1979). Our review of the record, however, indicates that we need not remand for the district court to determine whether it should have granted a new trial on this issue.
 
 
 44
 The partnership agreement in § 8.1 provided that LAR would have the exclusive right to serve as broker for sales of residential units and would receive five percent of the sales price on each sale, and that "[i]n exchange for the commission referred to in this Section 8 [LDC] shall furnish to the Partnership at [LDC's] sole cost and expense all sales services needed to market and sell the residential units to be constructed." I App. tab 2 at 24. The agreement also provided in § 8.3 that:
 
 
 45
 The Partnership shall loan to [LDC] from time to time such sums as are necessary to fund the costs of the marketing program as referred to in Section 8.1, hereof, at an interest rate and costs which are equal to that being charged the Partnership for such funds, and all advances thereunder shall be repayable in full, plus accrued interest, on December 31, 1987. Such maturity date may be extended upon mutual consent of the Partners.
 
 
 46
 Id. at 24-25.
 
 
 47
 Apparently LDC does not dispute that it received a loan of $176,094, which it never repaid.[3] Its principal argument is that because BMA exercised the buy-sell provision, BMA gave up its right to enforce LDC's obligation to repay the marketing loan. The buy-sell clause in the partnership agreement provided that "[t]he purchasing Partner shall indemnify and hold harmless the other Partner from all other obligations and liabilities which have accrued to such other Partner at the time of such purchase, ... by reason of such other Partner's participation in the Partnership." Id. at 29 (Section 15.4 of the Partnership Agreement).
 
 
 48
 As noted, the district court found that LDC breached the agreement to repay the loan and that BMA's exercise of the buy-sell agreement did not relieve LDC of that breach. Perhaps the court thought that although BMA asserted its intention to exercise the buy-sell agreement, the "time of such purchase" never occurred and thus the indemnity clause never became operative. It may have believed that the obligation to repay the loan was not an obligation that had accrued to LDC "by reason of [LDC's] participation in the Partnership." Although either of these interpretations may be reasonable, the jury could have found that the clause was indeed activated by BMA's notice that it intended to exercise the buy-sell option, and that the loan was an obligation that accrued by LDC's participation in the partnership. The jury also could have found the marketing clause language in § 8.1, that "in exchange for the commission referred to" LDC "shall furnish" marketing services, contemplated repayment of the marketing loan only if commissions were actually received. There was evidence that LDC never received any commissions.
 
 
 49
 BMA argues that LDC waived any right to the defense of this indemnity clause by language in a partial settlement agreement. In it BMA specifically agreed to indemnify LDC from some liability "as required by Sections 15.1.B.2, .3 and .4 of the Partnership Agreement," and the parties agreed that the settlement "shall not prevent BMA from asserting or recovering damages on any of its counterclaims in this litigation and shall not relieve the Plaintiffs from any obligation they may have to reimburse the partnership for marketing costs under Section 8 of the Partnership Agreement." Supp.App. 195-96. BMA argues that the quoted language constitutes an admission of LDC's liability for that loan. We believe the language does no more than preserve the parties' litigating positions on BMA's counterclaims, including this one.
 
 
 50
 Because our review of the record reveals evidence from which a reasonable jury could find under the circumstances that LDC was not obligated to repay the marketing loan and that a new trial would be improper, we reverse the district court's grant of BMA's motion for judgment as a matter of law on this issue. The district court's award of interest on the counterclaim award of $176,094 is also reversed.
 
 V
 
 51
 LDC and LAR have filed a separate appeal (No. 95-2096) challenging the district court's costs award of $63,701.97 against them. Their only argument is that the district court erred in determining that BMA was the prevailing party. Although we here reverse the Rule 50(b) judgment in BMA's favor on the $176,094 loan and the award of interest, that does not alter BMA's position as prevailing party below. It won on all issues, but received only nominal damages on its counterclaims. Therefore, we affirm the costs award. Because each party prevailed in part on this appeal, however, each shall bear its own costs of the appeal.
 
 
 52
 AFFIRMED in part, REVERSED in part.
 
 
 
 *
 The Honorable Ralph G. Thompson, United States District Judge, United States District Court for the Western District of Oklahoma, sitting by designation
 
 
 [1]
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cases are therefore ordered submitted without oral argument
 
 
 [2]
 This conclusion is not contrary to our prior decision in this case. Although we reversed the district court's summary judgment on the ground that, in view of LDC's other claims, it prematurely determined the validity of BMA's conduct, this did not preclude the court from finding, as a matter of law, that the guaranty agreement unambiguously did not require LDC's consent before the buy-sell provision could be invoked
 
 
 [3]
 We note the loan provision states that the partnership will loan the money; but the district court's judgment states that BMA loaned the money. If the partnership loaned the money, it might make a difference in the amount BMA should recover; but LDC did not make that argument. It makes no difference in the outcome under our analysis here